776 A.2d 47

**Robert John SUTTON**

**v.**

**STATE of Maryland.**

**No. 1630, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

July 6, 2001.

416

418

Michael R. Braudes, Asst. Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Zoe M. Gillen, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen, Baltimore and Joel Todd, State's Atty. for Worcester County, Snow Hill, on the brief), for appellee.

Submitted before SALMON, DEBORAH S. EYLER, and RAYMOND G. THIEME, Jr. (Retired, specially assigned), JJ.

RAYMOND G. THIEME, Jr., Judge, Retired, Specially Assigned.

Appellant Robert John Sutton, Jr. was convicted by a jury in the Circuit Court for Worcester County of felony-murder, first degree assault, robbery with a deadly weapon, and theft. Sutton appeals from his convictions and presents the following questions for our review:

1. Did the trial court err in failing to instruct the jury concerning voluntary intoxication?

2. Did the trial court err in permitting appellant to waive the right to counsel in mid-trial on the basis of reasoning and analysis which did not apply after the trial had commenced?

3. Did the trial court err in failing to weigh the potential for unfair prejudice against the probative value of appellant's prior convictions, and in admitting convictions which were inadmissible as a matter of law?

4. Did the trial court err in ruling that appellant would not be permitted to call certain witnesses?

5. Did the trial court err in instructing the jury that self-defense applied to the charge of first-degree assault and not to any of the other charges?

 

6. Did the trial court err in refusing to instruct the jury concerning second-degree murder and manslaughter?

### *Facts*

Shortly after 6:30 a.m. on April 30, 1999, the body of Thomas Lynch was discovered in the Inlet Parking Lot in Ocean City, Maryland, near large tents that had been erected for Ocean City's Spring Fest celebration. Also recovered near the tents was a large metal tent stake, which appeared to be covered with blood.

The Assistant Medical Examiner for the State of Maryland, who performed the autopsy on Lynch, testified that the cause of death was multiple severe skull fractures and brain injuries resulting from four blows to the head by a large blunt object. The medical examiner said that the injuries were consistent with being struck at least four times with the tent stake that had been found near the scene. The Assistant Medical Examiner further testified that the victim "probably would have lost consciousness and probably collapsed" from the first blow.

It was undisputed that appellant had struck Lynch in the head, but appellant denied the version of events as it was told by the State. The State contended at trial that appellant had killed Lynch during a robbery. On the other hand, appellant insisted that Lynch was actually the initial aggressor, and that appellant struck him in self-defense.

Evidence at trial established that, on April 29th, Lynch's employer had paid him in excess of $200.00 in cash. When his body was found the next morning, however, he had only twelve one-dollar bills and $8.82 in change in his pockets.

Testimony further adduced that Lynch was drinking at the Dutch Bar in Ocean City on the night of his death. During the course of the evening, he had become so intoxicated that he was denied further liquor. Appellant was present at the bar and subsequently attempted to purchase drinks for Lynch. Witness accounts established that Lynch and appellant left the bar together; one witness testified that this occurred at 12:30 a.m. on April 30, and another witness recalled that they left

the bar sometime between 11:30 p.m. and midnight. The homicide took place shortly thereafter.

It was established that following the homicide a cab driver picked up appellant at 12:52 a.m. and drove him from the Cork Bar to the Tavern By The Sea. According to the cab driver, appellant repeatedly and insistently asked him to drive to a place where he could obtain drugs and offered him $100.00 to do so. The cab driver testified that appellant had "a wad" of currency in his hand when he paid his fare.

Crucial testimony came from Tammy Lonsinger, the mother of appellant's child and his girlfriend at the time of the homicide. She recalled statements appellant had allegedly made to her. She said that she and her children were with appellant in Ocean City on the evening of April 29th. She recalled that she and appellant had gotten into an argument sometime around 10 11:00 p.m. and that appellant then left to go drinking on his own. She did not see him again until 2:00 a.m. the following morning, when he returned intoxicated. At that time he began talking loudly with her six-year-old son, Corey. It was her testimony that she overheard appellant tell Corey that "he had a lot of money . . . he said he had gotten it from a man [that he] beat the man and took the money . . . at that time he was saying [he beat him with] a crow bar." She also heard appellant tell her son that he had several thousand dollars, and that he was "trying to show him what a hundred dollar bill looked like and what a fifty dollar bill looked like." She testified that appellant later recounted to her slightly different accounts, in which he mentioned that he had struck the man with a tent stake or tent pole in order to take his money. Lonsinger testified that appellant told her that "[h]e did strike the man. . . . They went walking outside and when he went to throw up, he hit him once [with a tent pole] to take the money. . . . When he first told me, he had said that he had hit him because he wanted the money. Later, in other stories, he told me that he knew he hit him at least twice."

Detective Scott Bernal interviewed appellant in Pennsylvania after his arrest and took both an oral and written state-

ment. Appellant confessed to a plan to get Lynch as drunk as possible so that he could take his money, after which he "lost himself" and struck Lynch with a bar. In a statement, appellant told the police that, on the night in question, the victim had told him that he had $13,000 in his pocket. Appellant confessed that he decided to rough up the victim and take his money "when he told me about the [money] at the bar." He further admitted hitting the victim in the stomach with a heavy metal bar and then swinging the bar again, very hard like a baseball bat, this time hitting the victim in the head. The victim fell forward but gargled and blurted words, so appellant hit him again while he was on the ground. Appellant then went through the victim's pockets for the money that he thought was there. Appellant admitted that the reason he hit the victim in the head and stomach with the bar was so he would not struggle when he took the money. Appellant confessed to taking $160 from the victim.

At the close of the State's case, appellant discharged counsel, and resumed with his own defense. Appellant testified in his own defense, denied any robbery, and stated that Lynch was struck in self-defense. Appellant testified that he and Lynch left the Dutch Bar to find another bar that would serve Lynch. Lynch began to get angry and abusive, wrongly believing that appellant was among those responsible for throwing him out of the Dutch Bar. Lynch picked up a bar, threatened appellant, and "rammed" him. Appellant pushed back, and picked up the bar when Lynch dropped it. Lynch continued to be verbally abusive, and came at appellant with a large, heavy key ring. It was only at that point that appellant struck him in the head with the bar, which he believed was not the large, heavy stake entered into evidence by the State. Appellant also claimed at trial that he had given his earlier statements to police because he was coerced by officers who refused his request for counsel, threatened to prosecute his girlfriend, and told him what to write.

### *Discussion*

We note at the outset that appellant failed to raise several of his contentions at trial and, consequently, those issues have

not been preserved. Because this pertains to several of his contentions, we set forth the basic applicable principles on that point for the sake of efficiency.

Maryland Rule 4–323(a) requires that "[a]n objection to the admission of evidence shall be made at the time the evidence is offered or as soon thereafter as the grounds for objection become apparent. Otherwise, the objection is waived." Also applicable is Md. Rule 8–131(a), which provides:

The issues of jurisdiction of the trial court over the subject matter and, unless waived under Rule 2–322, over a person may be raised in and decided by the appellate court whether or not raised in and decided by the trial court. *Ordinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court* . . . .

(Emphasis added.)

We said in *Acquah v. State,* 113 Md.App. 29, 43, 686 A.2d 690 (1996), that "this Court will not decide issues unless they plainly appear to have been decided below." The Court of Appeals has stated: "We have repeatedly held that unless a defendant makes timely objections in the lower court or makes his feelings known to that court, he will be considered to have waived them and he can not [sic] now raise such objections on appeal." *Caviness v. State,* 244 Md. 575, 578, 224 A.2d 417 (1966) (citations omitted).

We shall find that no bases exist to overturn appellant's convictions. Although we have set forth, *supra,* a basic statement as to the facts of this case, we will supplement additional facts relevant to each issue as is necessary below.

## I. Voluntary Intoxication

 Appellant argues that the jury should have been instructed regarding the legal relevance of voluntary intoxication as it related to the intent element of the robbery charge. He claims that substantial evidence was adduced that he was intoxicated at the time of the offense, and that therefore voluntary intoxication was an issue that the jury could

have taken into account in determining whether the elements of robbery, and consequently felony murder, had been established. Appellant correctly points out that robbery is a specific intent crime, and voluntary intoxication is a matter that the jury could take into account in determining whether that intent element had been established. *Hook v. State,* 315 Md. 25, 32, 553 A.2d 233 (1989). Accordingly, appellant argues that the court erred in its failure to instruct the jury concerning the legal relevance of voluntary intoxication. Appellant concedes, however, that no exception was made to the failure of the trial court to propound this instruction, and that therefore this contention has not been preserved. He nevertheless argues that it would be appropriate for this Court to take cognizance of the matter under the plain error doctrine.

The plain error doctrine, established in Md. Rule 4–325(e), provides:

No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. *An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.*

(Emphasis added.)

In *Cook v. State,* 118 Md.App. 404, 702 A.2d 971 (1997), we discussed the plain error doctrine, stating:

"Under Maryland Rule 4–325(e), we possess plenary discretion to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court." *Danna v. State,* 91 Md.App. 443, 450, 605 A.2d 150, *cert. denied,* 327 Md. 627, 612 A.2d 257 (1992). Plain error is "error which vitally affects a defendant's right to a fair and impartial trial." *State v. Daughton,* 321 Md. 206, 211, 582 A.2d 521 (1990). An appellate court should address an

unpreserved error in only those instances which are "compelling, extraordinary, exceptional, or fundamental to assure the defendant a fair trial." *State v. Hutchinson,* 287 Md. 198, 203, 411 A.2d 1035 (1980). In deciding whether to exercise our discretion, this Court may consider the egregiousness of the error, the impact on the defendant, the degree of lawyerly diligence or dereliction, and whether the case could serve as a vehicle to illuminate the law. *Austin v. State,* 90 Md.App. 254, 268–72, 600 A.2d 1142 (1992). Nevertheless, "the touchstone remains, as it always has been, ultimate and unfettered discretion." *Id.* at 268, 600 A.2d 1142.

*Cook,* 118 Md.App. at 411–12, 702 A.2d 971.

The dispositive question, however, is whether the evidence at trial generated the issue of appellant's voluntary intoxication at the time of the murder. *Dishman v. State,* 352 Md. 279, 721 A.2d 699 (1998), states:

The task of this Court on review is to determine whether the criminal defendant produced that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to rationally conclude that the evidence supports the application of the legal theory desired.

*Id.* at 292, 721 A.2d 699.

We shall review the evidence to determine whether that minimum threshold was met. Appellant testified that he has a drinking problem. Between 10:00 and 11:00 p.m., he left his girlfriend after an argument, and went to the Purple Moose. There he had two beers and two tequilas. From there he went to the Dutch Bar. He and Lynch left the Dutch Bar sometime between 11:30 and 12:30 a.m.[1] After striking Lynch, appellant went to the Cork Bar, where he had a beer, and asked that a cab be called for him. At approximately 12:52 a.m., he was taken by cab to the Tavern by the Sea, which was another bar in the area. His sole testimony on his intoxication

---

**1.** Jackie Lynch, an employee at Dutch Bar, testified that appellant and Lynch left the bar between 11:30 and midnight; the bartender testified to them leaving at about 12:30 a.m.

was that "[he] was pretty lit" when he arrived back at the motel at approximately 2:00 a.m.

Joyce Skillman, a bartender at the Dutch Bar, testified that appellant was drinking beer, but that "[h]e didn't seem drunk." She said that even when he left the bar with the victim, appellant "seemed all right. He wasn't staggering or slurring his words." Jackie Lynch, who was working as a host at the Dutch Bar, also testified as to appellant's level of intoxication: "I wouldn't say he was to the point of intoxication. No slurring of his speech. He seemed to be coherent, understanding-and what word would I use. He seemed to be fine. I mean, just a tourist that was drinking. It wasn't to the point where I would have cut him off." He further testified that appellant was drinking beer and had a shot of tequila, but that "I don't believe he had that much to drink, honestly. . . . You know, I mean, but I didn't see him ordering a lot of drinks."

Billy Wilkins, the manager of the Cork Bar where appellant arrived immediately after the incident, was asked about what appellant had to drink while at the Cork Bar. He responded that appellant had "[a]t the most two beers, maybe two shots." He testified, "I thought that [appellant] may have had a buzz going," but made clear that he "didn't think he was like extremely intoxicated."

Testimony adduced that appellant remained in the Cork Bar for approximately a half-hour or forty-five minutes. A taxi cab was then called for him, and he proceeded to another bar, the Tavern by the Sea. David Brown was the cab driver who drove appellant from the Cork Bar to the Tavern by the Sea. He testified that he picked up appellant at 12:52 a.m., that appellant was acting "normal" at that time, and that appellant "wasn't drunk or anything. He was sober." Tammy Lynn Lonsinger testified that appellant returned to their hotel room at approximately 2:00 a.m. that morning, and that he "was intoxicated."

At first glance, testimony by Wilkins and Lonsinger appear to give credence to appellant's claim of intoxication. This is

misleading, however, in the context of this case. Appellant testified that he had two beers and two shots of tequila at the Purple Moose before he went to the Dutch Bar. He testified that he spent several hours at the Dutch Bar, but did not mention having any drinks there. He further testified that he and Lynch left the Dutch Bar together and arrived at the area with the tents, where the incident took place. He recalled having "snuck a beer out of the bar," and that he had given that beer to Lynch. Thus, the last place where appellant had drinks prior to his altercation with Lynch, according to his own testimony, was the Dutch Bar. Testimony from the employees of that bar, however, clearly failed to establish that he was intoxicated at that point.

Testimony by Wilkins pertained to the Cork Bar, but the evidence established that appellant arrived at the Cork Bar *after* the incident. Similarly, although his girlfriend testified that appellant was intoxicated when he returned to the motel room at about 2:00 a.m., this too was *after* the incident, and after he had consumed more alcohol at other bars. Therefore, testimony regarding appellant's state of intoxication at the Cork Bar, or at 2:00 a.m. in the motel room, is irrelevant and does not support appellant's claim of voluntary intoxication *at the time of the incident.*

In *Dykes v. State,* 319 Md. 206, 216, 571 A.2d 1251 (1990), the Court noted that the burden is on the defendant to initially produce some evidence on mitigation "sufficient to give rise to a jury issue." (quoting *State v. Evans,* 278 Md. 197, 208, 362 A.2d 629 (1976), superseded by statute on other grounds). The Court also said in *Evans* that, "if the defendant adduces no evidence of these matters, no issue of their existence is raised in the case and no jury instructions regarding mitigating circumstances or self-defense need be given."

We find that the issue of voluntary intoxication was not generated for purposes of requiring a jury instruction. Appellant's failure to request the instruction, or to object to the instructions as given, simply did not taint appellant's right to a fair trial, as no evidence was established at trial of any

impairment of his ability to form the specific intent to commit robbery at the time of the murder. Appellant himself did not testify that he was too intoxicated to form a specific intent at the time of the murder. Quite to the contrary, he testified that he was acting in self-defense. Thus, there is nothing egregious or extraordinary that would warrant the court's exercise of plain error review in this case.

## II. Waiver of the Right to Counsel

Appellant next contends that it was error for the trial court to permit him to discharge counsel and to proceed pro se after trial had already begun. After the State closed its case, appellant informed the trial judge that he wished to discharge counsel and represent himself.[2] A lengthy colloquy followed,

---

**2.** [Appellant]:I've been told by [defense counsel] what he thinks. He has already made an opinion from the testimony yesterday of the guiltiness or innocence of myself and I feel that his opinion in this—
[THE COURT]: You mean what the jury's verdict might be?
[Appellant]: What—no. What he as a lawyer already feels. He already feels that from yesterday I have been found guilty. He said-he wrote right on a piece of paper, "she just got you first degree murder." I feel that because of this he may not be able to go-I don't know these big words. He might not go all out and try to get in there and, you know, really kick butt, you know what I mean, because he already feels that I've been found guilty.
 \* \* \* \* \*
[THE COURT]: And I think he was just trying to keep you current on how he sees the case . . . But that doesn't mean, you understand, that he won't continue to fight for you just as hard as he can the whole way through.
 \* \* \* \* \*
[Appellant]: I don't think he's a bad guy, so I understand that. I just-[the Assistant State's Attorney], I mean, he's a big guy. You can't help notice him. He's all over the courtroom doing his thing. A lot of times [defense counsel] sat back and let things go by. He didn't get up. I don't think he really got up and got to the jury. I don't feel that everything was done that could have been done. I feel that's important.
[THE COURT]: And you think you can do better, is that what you're telling me?
[Appellant]: I can't do better as a lawyer, no, but I think that I can protect myself better. I was there. He wasn't.
 \* \* \* \* \*
[THE COURT]: . . . Young man, I think you're making a mistake, but it's your day in court.

whereby appellant provided the trial judge with his reasons for wishing to discharge counsel. Appellant was consequently permitted to waive his right to counsel and proceeded pro se. Appellant does not claim that his waiver was anything other than knowing and voluntary, but argues that what emerged is the trial court's erroneous view that appellant had an absolute right to waive counsel which would be honored regardless of the court's strong disagreement.

"A defendant's request to dismiss appointed counsel implicates two rights that are fundamental to our system of criminal justice; the defendant's right to counsel, and the defendant's right to self-representation." *State v. Brown,* 342 Md. 404, 412–13, 676 A.2d 513 (1996). Of course, "[t]o avail him or herself of the right of self representation, a defendant must knowingly and voluntarily waive the right to counsel." *Harris v. State,* 344 Md. 497, 505, 687 A.2d 970.

Ordinarily, Md. Rule 4–215 applies to protect both the right to assistance of counsel and the right to pro se defense when a defendant wishes to discharge counsel.[3] It

---

3. That rule provides, in pertinent part:

(e) *Discharge of counsel—Waiver.* If a defendant requests permission to discharge an attorney whose appearance has been entered, the court shall permit the defendant to explain the reasons for the request. If the court finds that there is a meritorious reason for the defendant's request, the court shall permit the discharge of counsel; continue the action if necessary; and advise the defendant that if new counsel does not enter an appearance by the next scheduled trial date, the action will proceed to trial with the defendant unrepresented by counsel. If the court finds no meritorious reason for the defendant's request, the court may not permit the discharge of counsel without first informing the defendant that the trial will proceed as scheduled with the defendant unrepresented by counsel if the defendant discharges counsel and does not have new counsel. If the court permits the defendant to discharge counsel, it shall comply with subsections (a)(1)-(4) of this Rule if the docket or file does not reflect prior compliance.

If the defendant requests dismissal of counsel in order to proceed pro se, and if the proposal to discharge counsel is timely and unequivocal, the court must ordinarily grant the request absent a recognized exception.

'Subsection (a) (1)-(4), in turn, provides as follows:

provides the trial court with the procedure that must be followed in such circumstances. That Rule does not apply in the instant case, however, because the Court of Appeals has made it very clear that where the *trial has already commenced,* as is the case here, Rule 4–215 *does not apply. Brown,* 342 Md. at 428, 676 A.2d 513. Instead, the matter is committed to the sound discretion of the trial judge, who must weigh and balance the relevant competing considerations. Our mode of review was established in *Brown:* "In evaluating trial court decisions on motions to dismiss counsel during trial, we shall apply an abuse of discretion standard." *Id.* at 429, 676 A.2d 513.

The Court of Appeals has stated:

[T]he trial court must determine the reason for the requested discharge before deciding whether dismissal should be allowed. While the trial court has broad discretion, once trial has begun, to determine whether dismissal of counsel is warranted, the court's discretion is not limitless. The court must conduct an inquiry to assess whether the defendant's reason for dismissal of counsel justifies any resulting disruption. This inquiry must meet constitutional standards....

We acknowledge that there is little to guide the trial judge in the exercise of this discretion. Therefore, in future proceedings, we suggest that the trial judge consider the following factors in deciding whether to permit discharge of counsel during trial: (1) the merit of the reason for dis-

(a) *First appearance in court without counsel.* At the defendant's first appearance in court without counsel, or when the defendant appears in the District Court without counsel, demands a jury trial, and the record does not disclose prior compliance with this section by a judge, the court shall: (1) Make certain that the defendant has received a copy of the charging document containing notice as to the right to counsel. (2) Inform the defendant of the right to counsel and of the importance of assistance of counsel. (3) Advise the defendant of the nature of the charges in the charging document, and the allowable penalties, including mandatory penalties, if any. (4) Conduct a waiver inquiry pursuant to section (b) of this Rule if the defendant indicates a desire to waive counsel.

charge; (2) the quality of counsel's representation prior to the request; (3) the disruptive effect, if any, that discharge would have on the proceedings; (4) the timing of the request; (5) the complexity and stage of the proceedings; and (6) any prior requests by the defendant to discharge counsel.

*Id.* at 428, 676 A.2d 513.

Here, meaningful trial proceedings clearly had begun.[4] Appellant's request to discharge counsel came after the State had rested its case. The trial court determined that appellant and his defense counsel disagreed over whether to call certain witnesses. An in depth inquiry was conducted by the trial court regarding appellant's wish to discharge counsel, and this inquiry sufficiently satisfied constitutional standards. The trial judge carefully explained to appellant that he was facing first degree murder charges, and that the State was seeking life imprisonment without the possibility of parole. The trial judge further explained the other charges and possible penalties that appellant was facing. He strongly recommended against discharge of counsel. The trial judge carefully considered appellant's reasons for requesting dismissal, and ultimately concluded that appellant's waiver of the right to counsel was knowingly and voluntarily made.

■ Appellant does not contest the fact that an extensive inquiry was made by the trial judge, nor does he claim that the inquiry failed to meet constitutional standards. Appellant argues, however, that the trial judge mistakenly believed that there existed no choice but to grant appellant's wish to discharge counsel. Thus, appellant maintains that the trial judge essentially failed to apply any discretion when he permitted appellant to discharge counsel. Appellant apparently arrives at this contention based on the trial judge's statement to appellant that "you do have an absolute right to represent

---

4. In *Brown*, as in the instant case, appellant had requested permission to dismiss his counsel after the State had presented evidence in its case-in chief. The Court concluded that under those circumstances, "meaningful trial proceedings had commenced." *Id.* at 429, 676 A.2d 513.

yourself." We decline the invitation by appellant to read this statement in a vacuum. Immediately after making that statement, the trial judge said: "I'll respect that right as much as I'll respect your right to counsel." That language clearly indicates that the trial judge did indeed apply his discretion to the decision at hand. The mere mention by the trial judge of the competing interests at force here, namely self-representation and the right to counsel, makes it clear that the trial judge understood, appreciated and applied a balancing of these interests in arriving at his determination. If the trial judge had been exercising no discretion at all, then there would have been no reason for him to make mention of his respect for, and weight given to, appellant's right to counsel.

The trial judge strongly advised appellant against discharging counsel, but at the same time placed high value upon appellant's repeated wishes to represent himself. It was not that the trial judge used no discretion in his finding on this topic; rather, he regarded appellant's wish to proceed pro se as an inherently significant right to be given utmost respect. This formidable emphasis placed by the trial judge on appellant's insistence on self-representation is clear from this statement to appellant while the colloquy on this subject was taking place:

> And you know, I'll respect that right as much as I'll respect your right to counsel. I'm a little saddened, quite frankly, that you're proceeding this way, but you know, it's your day in court. That's what I used to tell people I represented. We would fight, argue, disagree, but ultimately I knew that it was their day in court and not mine. No matter what happened, I was going home that night and they might go to jail.

As we have said, Md. Rule 4–215 does not apply in situations where meaningful trial proceedings have already begun. Thus, it was incorrect for the trial judge to address that Rule and to conduct an inquiry essentially based on this Rule. We point out that it is imperative for trial judges, when confronted with a situation as is the case here, to spell out for

the record the reasoning they utilize in exercising their discretion on this point. It can be said that the trial court was mistaken by focusing its inquiry on Rule 4–215, rather than making it abundantly clear that it was applying its discretion in this decision. We think, however, that in the instant case the trial judge, in an overabundance of caution, applied Md. Rule 4–215 not *instead* of the application of his own discretion, but rather in *addition to* deciding the matter within his discretion.

We think it necessary to clarify why the trial court is to exercise its discretion in such circumstances, and to explain why this situation is to be dealt with differently depending on whether trial has already commenced. In order to hone in on these points, we think it elucidating to set forth in greater detail the discussion by the Court of Appeals in *Brown*. At the beginning of its analysis, the Court stated: "[O]nce meaningful trial proceedings have begun, the right to substitute counsel and the right to defend pro se are curtailed to prevent undue interference with the administration of justice." *Brown*, 342 Md. at 412, 676 A.2d 513. (citation omitted). "In the absence of such a limitation, defendants could use 'eleventh hour' requests to discharge counsel as a tactic to delay the proceedings or to confuse the jury." *Id.* at 414–15, 676 A.2d 513. (citations omitted). "If the court concludes that the defendant's request to dismiss counsel was not made in good faith but [was] a transparent ploy for delay, the court may exercise its discretion to deny the request." *Id.* at 416, 676 A.2d 513 (citation and internal quotation marks omitted).

Although the Court of Appeals did not decide in *Brown* whether a request to proceed pro se should be considered differently than a request to substitute counsel,[5] the Court did note that "[s]ome courts have suggested that the standard for evaluating requests to defend pro se should be more permis-

---

5. The Court stated in *Brown* that "because the trial court did not determine whether the defendant sought substitute counsel or pro se defense, we need not reach the issue of whether the standards differ." *Id.* at 418, 676 A.2d 513.

sive than the standard for evaluating requests for substitute counsel." *Id.* at 418, 676 A.2d 513 (citation omitted). We do not attempt to establish a different standard today, but we do think it insightful in the context of the instant case to consider why different standards could be conceivable. In *Brown*, the Court of Appeals found that Md. Rule 4–215 did not apply once trial commenced because at that point a request to discharge counsel could cause a greater interference with the orderly pursuit of justice. The Court said:

> [R]equiring trial courts to adhere to the Rule throughout trial would present unnecessary and cumbersome procedural obstacles to an efficient trial. For example, if Rule 4–215(e) applied throughout the trial, it would require the court to permit dismissal of counsel if the defendant could demonstrate a meritorious reason, regardless of any countervailing considerations. This interpretation would increase the risk of disruption and jury confusion, consequently increasing the risk of mistrial.

*Id.* at 427, 676 A.2d 513.

A thorough reading of *Brown* establishes that the Court was concerned with the possibility of a defendant requesting a discharge of his counsel for no good reason other than for purposes of causing delay and confusion. This could be initiated by a desperate defendant in a last-minute effort to cause delays when he realizes his trial is not going his way. It is precisely this type of bad-faith legal maneuvering, when clearly not based on merit, that we aim to avoid.

It seems likely that a substitution of counsel potentially can cause much more delay and confusion than a situation whereby a defendant discharges counsel and proceeds pro se. In a situation involving self-representation, the defendant is already familiar with his case and presumably could pick up where his counsel left off. On the other hand, substitute counsel would likely be coming into the case with no prior exposure to the particular facts and would probably require additional time to become acclimated with the case.

In the instant case, there was no indication to the trial judge that appellant's request to proceed pro se would cause much delay. Additionally, the record does not demonstrate that appellant's request was due to an attempt to hinder the efficiency of his trial. It clearly appears from the record that appellant was genuinely concerned about his counsel's zeal in defending him, and whether counsel's perceptions were affecting his representation at trial.

We think the situation in the instant case is distinguishable from that of other cases whereby an appellant requested to proceed pro se and was denied that right. In such circumstances, we would think that one has more grounds for complaint, as he has requested something and not received it. In this case, however, we think it fitting to remind appellant that one should "be careful what you ask for, because you might just get it." Appellant asked for permission to proceed pro se, and received his wish.

■ Under the totality of these circumstances, we would be hard pressed to find that appellant was denied his right to counsel or that the trial court's finding on this issue was reversible error. Appellant has presented no legal authority supporting his claim of reversible error. The trial judge asked defense counsel if he would remain at the counsel table with appellant throughout the trial in order to assist him. Defense counsel agreed to do so, and in fact assisted appellant with legal questions for the remainder of the trial. Moreover, at the time the discharge of counsel was permitted, the trial judge informed appellant that he would entertain a future request from appellant to resume representation by counsel in the event appellant changed his mind about proceeding pro se:

If you change your mind, if you change your mind and you want [defense counsel] at some point in time, I'll consider it, how's that? If you change your mind during the course of the balance of the trial and you tell [defense counsel], we'll approach, come up here to the bench and perhaps [defense counsel] would be willing to reenter his appearance in the case.

Appellant never changed his mind regarding his self-representation—not until *after* he was convicted. We reject appellant's attempt at hedging his bet in this regard, and we conclude that the trial court did not commit reversible error on this issue.

### III. Prior Convictions

Appellant testified in his own defense, and was impeached with a series of prior convictions. He asserts that he was not informed that his prior convictions could be utilized to impeach his credibility if he chose to testify. Additionally, he offers the following two-pronged contention regarding his impeachment: He claims that the trial court erred by not weighing the potential for prejudice of any of the convictions against their probative value, and that the trial court erred by permitting impeachment with convictions that are inadmissible to impeach. On the latter assertion, he points to his prior convictions of possession of a bag of marijuana, underage drinking, and a juvenile conviction as convictions that are inadmissible to impeach. He concedes that he made no objections at trial on these points, but argues that the plain error doctrine nonetheless requires reversal of his convictions.

The advice appellant received from the trial judge regarding his intention to testify, in relevant part, was as follows:

[THE COURT]: ... If you choose to testify, you will be subject to cross-examination by the State's Attorney and the court can also ask you questions. If you choose not to testify, the jury nor I can draw any inference that you were guilty because of that election, and I would tell the jury that if you asked me to; I would tell the jury they should not even discus [sic] or consider such matters in the jury room in arriving at a verdict as to guilt or innocence.

Now, do you understand everything I just told you?

A: Yes, sir.

[THE COURT]: Knowing what I've just told you, do you wish to testify?

A: Yes, sir.

Subsequently, the following transpired on cross-examination of appellant:

Q: Mr. Sutton, when you left Pennsylvania you said you left because you knew you were going to be arrested for violating your parole?

A: Yes, sir.

Q: What were you on parole for?

A: I was on auto parole. I was on probation. I should have brought this with me, but that's okay. I was on probation for a DUI, a DUI. No, no, no. I went to jail for ninety days for DUI and driving while suspended and I was on probation for theft.

Q: Now, this isn't the first time you've had problems with the law, is it?

A: No, sir, it's not.

Q: Can you tell the jury what your criminal record is?

A: Sure. When I was—I'll tell you the whole thing. If I miss something, I'm sure he'll tell me.

When I was about sixteen, I was arrested with a bag of marijuana. When I was seventeen, I was arrested for underage drinking. Also when I was seventeen, I stole a Cadillac and wrecked it. Out of that wreck, I ran from the scene. Some police officers seen me, I tried to get away from them. The one grabbed a hold of me, bent my arm half way up behind my back, I turned—

[THE COURT]: I'm going to interrupt this. We're not going to go through the facts of every other case.

A: I'm sorry.

[THE COURT]: Well, it's not really your fault. It was the way the question was posed to you. Please be specific, Mr. Collins.

Q: Mr. Sutton, were you convicted of two counts of burglary in December of 1991?

A: Yes, when I was eighteen years old. Yes.

Q: Convicted of two counts of theft in 1991?

A: They were the same as the burglary.

Q: Four counts of theft?

A: In Pennsylvania, if you get charged with burglary, they add theft receipt. It's all one charge. They just add everything to it. Yes. Yes, I was.

Q: Six counts of receiving stolen property?

A: All from the same thing, yes.

Q: Two counts of forgery?

A: From the same thing, yes.

Q: And the theft of a motor vehicle?

A: From the same incident, yes. All one incident.

Q: Were you also convicted of making a false statement to the police?

\* \* \* \* \*

A: I told—yes, I was.

Q: Were you also convicted of making another false statement to the police, a false report to a police officer on August 7, 1998?

A: Just a year and a half ago.

Q: Again, convicted of receiving stolen property in 1998?

A: You say "convicted." I signed a plea to no contest for a reason.

Q: You were found guilty of it; right?

A: No, I wasn't.

Q: You pled no contest to it?

A: Yes, I did

Q: And in July of 1999 of theft?

A: Oh, I'm sorry. The last one, '98, theft? Oh, I'm sorry. I'm sorry. I got confused. The theft that they charged me with was a license plate on my car that my girlfriend gave me.

Q: But you were charged with it and you were convicted of it?

A: And she went into court and simply testified that it was not stolen. That was a court error that this license plate belonged—or was stolen. In fact, it wasn't stolen. It

was her's and her ex-husband's. We stuck it on my car because I couldn't get a license. In 1999 I took a plea to no contest to receiving stolen property and theft, yes.

## The Warning

██ Appellant's contention that the trial court erred in admitting evidence of appellant's past convictions is not preserved under Maryland Rule 4–323(a), as appellant himself admits that he made no objection to the admissibility of his prior convictions. Thus, the current issue is waived on appeal. Appellant argues, however, that we should consider this issue under the plain error doctrine irrespective of whether it was preserved at trial. "[W]ith respect to jury instructions, and as the cases hold with respect to errors of law generally, an appellate court may in its discretion in an exceptional case take cognizance of plain error even though the matter was not raised in the trial court." *Rubin v. State,* 325 Md. 552, 587, 602 A.2d 677 (1992) (quoting *Dempsey v. State,* 277 Md. 134, 141–42, 355 A.2d 455 (1976)). *See also State v. Daughton,* 321 Md. 206, 210–11, 582 A.2d 521 (1990) ("[A]n appellate court may recognize *sua sponte* plain error, that is, error which vitally affects a defendant's right to a fair and impartial trial.").

██ In *Rubin,* the Court of Appeals addressed what circumstances would trigger the exercise of plain error discretion:

[W]e have characterized instances when an appellate court should take cognizance of unobjected to error as compelling, extraordinary, exceptional or fundamental to assure the defendant of [a] fair trial. We further made clear that we would intervene in those circumstances only when the error complained of was so material to the rights of the accused as to amount to the kind of prejudice which precluded an impartial trial.

*Rubin,* 325 Md. at 588, 602 A.2d 677 (citations and quotation marks omitted).

 In order to assess whether there was plain error, it is necessary to review the materiality of the alleged errors in the context in which they occurred. As we do so, we find that the contentions that were not preserved by appellant do not "rise to the level of the deprivation of a fair trial." *Id.*

 We agree with appellant that the trial judge did not inform appellant that his prior convictions could be utilized to impeach him if he chose to testify. It is well-established, however, that this represents no error. "A trial judge has no obligation to advise a defendant, whether or not represented by counsel, with respect to the possibility of impeachment if the defendant elects to testify, but, if the trial judge undertakes to do so, he or she must do so correctly." *Williams v. State*, 110 Md.App. 1, 32, 675 A.2d 1037 (1996). In *Morales v. State*, 325 Md. 330, 600 A.2d 851 (1992), the Court of Appeals stated that "while the *trial court was not required to further inform Morales that he could be impeached by his prior convictions if he took the witness stand,* since the trial judge elected to do so, he should have done so correctly." *Id.* at 335, 600 A.2d 851 (emphasis added).[6] It was stated further in that case:

> *The trial court was not required to inform Morales of the possibility of impeachment.* When a defendant in a criminal case knowingly and voluntarily elects to proceed without counsel and manage his or her own defense, he or she "relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel." *Faretta v. California*, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562, 581 (1975). Counsel would presumably know of the defendant's prior criminal convictions and could advise the defendant whether these specific convictions could be used to impeach. It would be extremely difficult for the

---

**6.** The judgment in that case was reversed not because the trial judge failed to inform Morales of the possibility that he would be impeached, but rather because the trial judge, once he did so, "may have misled Morales regarding impeachment by prior convictions and, thereby, influenced him not to testify." *Morales,* 325 Md. at 335, 600 A.2d 851.

judge to give an unrepresented defendant a meaningful summary of the general law of impeachment by prior convictions and the trial judge should not be in a position of having to inquire about the defendant's prior convictions in order to give advice about potential impeachment. If the trial judge assumes the responsibility of giving such advice, the judge in effect becomes the defendant's lawyer. A defendant is not entitled to have the trial judge act as his or her attorney.

We are persuaded by the Court of Special Appeals' holding in *Martin v. State* [73 Md.App. 597, 603, 535 A.2d 951(1988)], that the trial court was not required to inform the unrepresented defendant that he could be impeached by the State on cross-examination. In *Martin,* the trial court told the defendant that he had the right to testify or refuse to testify and that it wouldn't be held against him if he elected to remain silent. The intermediate appellate court noted that this information sufficed and that the defendant should not expect the trial judge to advise him on the law of impeachment or to act as his lawyer.

*Id.* at 336–37, 600 A.2d 851 (emphasis added).

Appellant concedes that the handling of this matter by the trial judge was "technically correct," but argues that it "led to a prejudicial aftermath." We interpret this language by appellant to mean the following: "Although the trial judge acted in accordance with the applicable law, he erred nonetheless because, well, simply because I was convicted." More specifically, when appellant suggests a "prejudicial aftermath," he is referring to the fact that the prosecutor "took full advantage of Appellant's defenselessness" by questioning him about his prior convictions, and that consequently this information affected the findings by the jury. Whether appellant is correct on this point has no significance. The trial judge's correct ruling continued to be a correct ruling regardless of whether the State took advantage of that ruling. That was the obvious consequence of the ruling, and appellant has failed to direct us to any authority to indicate to the contrary.

Had the trial court *incorrectly* informed appellant of the possibility of impeachment, the situation would be different. But here the trial court did not inform appellant at all about potential impeachment by prior convictions. We conclude on this issue that the trial judge had no duty to inform appellant of the possibility that he could be impeached by his prior convictions if he testified, and thus there is obviously no grounds for plain error discretion on this point.

## The Balancing

We consider next appellant's claim that the trial court erred by not weighing the potential for unfair prejudice of any of the convictions against their probative value. We point out once again that this contention was not preserved at the trial level. Thus, we consider whether plain error discretion should be exercised.

Maryland Rule 5–609(a) provides:

For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during examination of the witness, but only if (1) the crime was an infamous crime or other crime relevant to the witness's credibility and (2) the court determines that the probative value of admitting this evidence outweighs the danger of unfair prejudice to the witness or the objecting party.

It has been said by the Court of Appeals that the Rule "requires a preliminary determination of probativeness and potentially unfair prejudice for all convictions used to impeach credibility." *Jackson v. State,* 340 Md. 705, 714, 668 A.2d 8 (1995) (quoting *Beales v. State,* 329 Md. 263, 270, 619 A.2d 105 (1993)) (emphasis omitted).[7] In *State v. Woodland,* 337 Md. 519, 526, 654 A.2d 1314 (1995), the Court of Appeals stated that "[a]lthough the trial judge did not expressly describe the

---

**7.** In *Beales,* the Court was addressing Md. Rule 1–502, which was the virtually identical predecessor to Md. Rule 5–609. Thus, that statement continues to apply accurately the law on point.

considerations that led her to conclude that [defense witness]'s drug conviction was admissible to impeach [t]here is no requirement that the trial court's exercise of discretion be detailed for the record, so long as the record reflects that the discretion was in fact exercised." *Id.*

We think that the trial court erred by failing to make an adequate showing as to the requisite balancing of the convictions pursuant to Md. Rule 5–609. Nevertheless, we cannot find that the trial judge's failure to make the record clear on this point rose "to the level of the deprivation of a fair trial." *Rubin,* 325 Md. at 588, 602 A.2d 677. As such, we find no plain error.

In this instance, the trial court's error represented a technical deficiency, but that error did not represent a substantive error in the fairness of appellant's trial. That is because the trial court only erred by its failure to make a showing for the record that the balancing had taken place. We find that most of the convictions in question in the present case so obviously passed muster under the relevant balancing that the trial court may have concluded that the showing on the record would be no more than a waste of time. In other words, it is clear, based on the applicable law, that the record would have displayed the obvious in this case, and that the balancing test regarding the convictions would have been essentially a formality. Although we certainly do not condone the failure by the trial court to make the determination for the record, we nevertheless cannot find that this error amounted to plain error.

There is a "strong presumption that judges properly perform their duties." *Woodland,* 337 Md. at 526, 654 A.2d 1314. (citation omitted). Here, the trial judge's interruption regarding the offense of making a false statement renders it clear that the trial judge was paying close attention to the questioning about the prior convictions, and that he did in fact exercise his discretion as to whether to admit the prior offenses. In *Jackson,* 340 Md. at 717, 668 A.2d 8, the Court of Appeals said:

Numerous courts around the country have established guidelines to be considered in weighing the probative value of a past conviction against the prejudicial effect.... These factors are (1) the impeachment value of the prior crime; (2) the point in time of the conviction and the defendant's subsequent history; (3) the similarity between the past crime and the charged crime; (4) the importance of the defendant's testimony; and (5) the centrality of the defendant's credibility.... While these factors should not be considered mechanically or exclusively, we believe they may be a useful aid to trial courts in performing the balancing exercise mandated by the Rule.

*Id.* (citations and emphasis omitted).

■ Utilizing these factors here, we observe that the prior convictions, based on the types of crimes they represented, had significant impeachment value; the prior convictions were close in time to the present incident; there was not much similarity between the prior convictions and this incident, as this incident involved violence, whereas none of the prior convictions consisted of violence; appellant's testimony was very important, as it essentially represented his entire defense; and appellant's credibility was very critical to the case, as his defense entirely hinged on his credibility. Therefore, as every guideline is clearly established, it is very easy to see that the probative value of appellant's past convictions greatly outweighed their prejudicial effect.

■ We stress our recommendation to trial judges to make the record very clear regarding the explicit factors critical to their decisions as to the balancing that is required in this sense. This will undoubtedly "avoid the unnecessary raising of the issue of whether the judge has meaningfully invoked his discretion under Rule 609." *Id.* (emphasis omitted). Although this was not done here, we reiterate that the admission of the prior convictions nevertheless does not call for us to exercise discretion under the plain error doctrine.

*The Extras*

Appellant argues that the trial court erred by admitting for impeachment purposes certain convictions that "are inadmissible to impeach as a matter of law." He asserts that this occurred when the trial court admitted testimony pertaining to appellant's prior convictions for possession of a bag of marijuana, underage drinking, and a theft that may have been committed when appellant was a juvenile. Appellant again claims that "recognition of plain error is in order," and, once again, we disagree.

The trial court properly admitted evidence of appellant's other prior convictions on numerous counts of burglary, theft, receiving stolen property, forgery, and making false statements to the police. Thus, any error in admitting convictions for possession of a bag of marijuana, underage drinking, and a juvenile theft conviction, was trivial, for these convictions clearly paled in comparison in impeachment value compared to the other convictions. We conclude, therefore, that there was certainly no plain error in this regard.

## IV. Calling of Witnesses

Appellant argues that the trial court erred by refusing to allow him to call certain witnesses after he had discharged counsel. We disagree. After appellant discharged counsel, he engaged in a lengthy discussion with the trial judge regarding the witnesses that he wished to call. With the court's assistance he was able to call almost every witness whom he had named. Nevertheless, he complains that he was denied "due process of law and compulsory process for obtaining witnesses" by the court's denial of his request to call three particular witnesses: the victim's mother; Jason Shotwell, who had been a friend or coworker of the victim; and the Assistant Medical Examiner.

*The victim's mother*

With regard to the victim's mother, the following transpired:

[Appellant]: (Unintelligible name.)

[THE COURT]: Who?

[Appellant]: Thomas Lynch's mother.

[THE COURT]: No, she cannot be called. Has she been in the courtroom?

[PROSECUTOR COLLINS]: The victim's mother, yes, she has been.

[Appellant]: Am I allowed to read from a statement she made? I think it's important.

[THE COURT]: Well, you may or may not. I don't know about that. But you can't call her—

[Appellant]: Okay.

[THE COURT]:—because she has not been sequestered.

[Appellant]: Okay. Okay. Well, I can take care and-

[THE COURT]: She wasn't there. She wouldn't know about it.

[Appellant]: Well, she made a statement to some police officers that is in the package there that changes stuff.

[THE COURT]: Who was that?

[PROSECUTOR COLLINS]: She's the last person in the— he's talking about the deceased's mother.

[THE COURT]: Okay I mean, the mother wasn't there.

[Appellant]: I don't want to get her up there. That's nasty anyway, but I want to get—

[THE COURT]: But she wasn't there.

[Appellant]: No, but she made some-there were some comments made that he was a happy-go-lucky drunk and he was not, nowhere near that. She made comments, I believe.

[THE COURT]: Well, the testimony was that night he was a happy-go-lucky drunk. She wasn't there that night.

[Appellant]: No, but she would know him best.

[THE COURT]: Yes, maybe so. But you were there that night. Now some of these other people—

[Appellant]: I can't—

[THE COURT]:-you mentioned witnesses—

[Appellant]: I can't—

[THE COURT]:—you may be able to get here from that night.

[Appellant]: I can't call her, okay. Okay. I understand. I understand that [I] am allowed to-anything that's in those reports, am I allowed to mention that they're in the reports?

 Appellant argues that the trial court erroneously ruled that because the victim's mother had been in the courtroom she would not be permitted to testify. Although it is true that even a violation of a sequestration rule itself does not automatically justify barring a witness from testifying, *see Redditt v. State,* 337 Md. 621, 629, 655 A.2d 390 (1995), in this case the fact that the victim's mother was present in the courtroom was not the only factor considered by the court. To the contrary, the court also noted that "the mother wasn't there [on the night of the murder]." Thus, the court properly recognized that the proffered testimony of the victim's mother that her son was not a happy-go-lucky drunk would be irrelevant. *See White v. State,* 324 Md. 626, 637, 598 A.2d 187 (1991) (noting that "[a] trial court's determination on relevance will not be reversed by an appellate court absent a clear showing that it abused its discretion.") (citations omitted). *See Thomas v. State,* 301 Md. 294, 317, 483 A.2d 6 (1984) (stating that "[d]ecisions on the relevance of evidence rest in the sound discretion of the trial court and will not be reversed absent a showing that such discretion was clearly abused.") (citation omitted). We find no abuse of discretion regarding the trial court's refusal to allow appellant to call the victim's mother to the stand.

### *Jason Shotwell*

The following took place at trial regarding testimony by Jason Shotwell:

[Appellant]: Jason Shotwell. I didn't see him yesterday, but I believe he was on the witness list. Is he here?

[THE COURT]: I don't know who he is.

[PROSECUTOR COATES]: He was excused. He was a potential witness, Your Honor.

[THE COURT]: Summonsed by who?

[PROSECUTOR COLLINS]: I don't know. I think we summonsed him.

[PROSECUTOR COATES]: Yes.

[PROSECUTOR COLLINS]: But we did not intend to use him. I believe he had been told that he could go home.

[PROSECUTOR COATES]: I don't even know that he came.

[THE COURT]: Who is he?

[Appellant]: He was the man playing pool with me. He was right there when a lot of stuff that I think is crucial was done and said. I believe he is very, very important.

[THE COURT]: Where is he from? Anybody?

[PROSECUTOR COATES]: I believe he's from out of town, like the Washington area, wasn't it? I'd have to check, Your Honor. It should be in the file.

[THE COURT]: Do you understand we're not going to delay the trial for this witness?

[Appellant]: I realize that. Is there any way we can make an attempt to contact him and ask—is there anyway possible? If not, am I allowed to—I know in the rule that I'm allowed to reflect on the testimony of them that are here, but can I be allowed to bring that in? I believe he may have had a very strong—am I allowed to reflect on his testimony at all?

[THE COURT]: For what?

[Appellant]: Him being there. He has seen a lot of stuff that went on. Am I allowed to say that? I would only go by his testimony and statement. Nothing else.

[THE COURT]: Well, in the first place, you can testify to that yourself.

[Appellant]: Okay.

[Appellant]: The other witnesses, Shotwell, I guess no?

[THE COURT]: Who? Shotwell?

[PROSECUTOR COATES]: He's the gentleman who we believe is living somewhere on the western shore, like the Baltimore area or something like that. It should be in the file, Your Honor.

[THE COURT]: He's been excused? He's been excused?

[PROSECUTOR COATES]: He has been excused.

The State had subpoenaed Shotwell but then decided not to use his testimony and released him. Although this matter was not fully developed at trial, at the hearing upon appellant's motion for new trial appellant proffered that Shotwell was a friend or coworker of Thomas Lynch, and that Shotwell was present and playing pool with appellant at the Dutch Bar. According to appellant, Shotwell could have been expected to testify that Lynch was not a "nice guy" when drunk, but instead was aggressive and was "yelling and screaming" at appellant in the bar that night. Additionally, appellant stated that Shotwell would have testified that Lynch was freely giving away his money, and therefore would not have possessed a "wad" for appellant to later steal. The trial court, however, in denying the motion for new trial noted that the defense had not at any point subpoenaed the witness.

Moreover, the trial court noted that Shotwell would have had no knowledge as to the events that took place after appellant and Lynch left the bar. The trial judge also said the following regarding the statement appellant wished to have Shotwell corroborate: "Well, that's contrary to all the other evidence in this case .... including your own statement, I might add." We also point out that it would have been irrelevant to demonstrate that Lynch was giving away money at the bar. Even assuming that to be true, appellant has presented no evidence regarding how much money Lynch had in his possession before he began giving away his money. Thus, it is irrelevant that Lynch had been giving away his money because he may have possessed a "wad" of money even after he gave away a large amount of money to the patrons at the bar. In fact, it can be assumed that Lynch may have began the night with two "wads," gave away one entire "wad,"

but nonetheless possessed the remaining "wad" at the time of the incident.

 Any error on this point was harmless in light of the overwhelming testimony contradicting the statement appellant wished to have Shotwell corroborate. We find no abuse of discretion regarding the trial court's refusal to allow appellant to call Jason Shotwell to the stand.

### Assistant Medical Examiner

At the conclusion of the testimony of the Assistant Medical Examiner, both the State and defense counsel agreed that he could be excused. During the second day of trial, while appellant was discharging counsel, the following transpired:

[THE COURT]: Do you know you cannot call witnesses who have been discharged? In other words, as each witness has testified, I have asked both your counsel and I've asked the State's Attorney, any reason to keep this witness around, and in most instances the answer has been "no." All right. Do you understand that?

[Appellant]: Yes, sir ... I'm not sure of everybody that was dismissed. I know that the medical examiner is a big part of what I have to say, along with the Ocean City evidence guy. Either one. I know that the evidence guy was held, but was the medical examiner?

[THE COURT]: Well, you can—the witnesses that have been discharged have been discharged. The witness, for instance, the pathologist, the doctor—

[Appellant]: Yes.

[THE COURT]:—he's not a local witness. He's from Baltimore.

[Appellant]: He is—am I allowed to, if he is still here am I allowed to use him?

[THE COURT]: If he's still here, but he isn't. I mean—

\* \* \* \* \*

[Appellant]: The medical guy, but he's—

[THE COURT]: He was excused and he's gone.

 Appellant argues that the preclusion of the testimony by the medical examiner was error because the court both abused its discretion, and failed to properly exercise that discretion. The trial court, in refusing to recall the medical examiner, observed that the witness had returned to Baltimore and therefore was not available. Appellant did not at that point make the sort of proffer of anticipated testimony that is required. Thus, this issue is waived on appeal. Where evidence is excluded, a proffer of substance and relevance must be made in order to preserve the issue for appeal. *Conyers v. State*, 354 Md. 132, 164, 729 A.2d 910 (1999).

 Moreover, the witness had already been excused when appellant asked to recall him. Thus, it was within the trial judge's discretion as to whether to allow appellant to recall the witness. "Whether a party may recall a witness for further direct or cross after he or she has conducted direct or cross-examination of the witness is within the trial court's discretion." *Channer v. State*, 94 Md.App. 356, 367, 617 A.2d 1092 (1993) (citation omitted).

 Even assuming that the trial court did err, any such error was harmless beyond a reasonable doubt. The record reflects that thereafter during trial appellant "wished to recall the doctor to rebut assertions that appellant had stated that he had struck the victim while the latter was vomiting, and that he had dragged Mr. Lynch from one location to another." We point out that appellant was able to elicit from Officer Chamberlain what he wished to elicit from the medical examiner, namely that he did not notice any vomit or drag marks at the scene of the crime. Thus, it would have been simply redundant to elicit that same information from the medical examiner.

 The court did not abuse its discretion in determining not to recall the assistant medical examiner, who was not a local witness. There is no reasonable possibility that the outcome of the trial would have been different had the witness been recalled to testify.

 We conclude our discussion on this point by stating that we find no abuse of discretion by the trial court in its refusal to procure the testimony appellant sought pertaining to these three witnesses. Further, even if the trial court erred, we hold that any error was harmless beyond a reasonable doubt as the three witnesses' testimony would not have changed the outcome of this case. *Conyers* at 166, 729 A.2d 910.

## V. Self defense

 Appellant next contends that the trial court erred in instructing the jury that self-defense applied only to first degree assault and not to felony murder. The court explicitly instructed the jury that self-defense applied to first-degree assault, and "to no other charge that the Defendant is facing."

Appellant, citing *Dykes v. State*, 319 Md. 206, 571 A.2d 1251 (1990), suggests that under the "some evidence" test, a self-defense instruction should have been propounded because there was some evidence of each of the required elements of the theory of self-defense. He contends that under appropriate circumstances self-defense is a defense to robbery, and therefore to a felony-murder in which robbery is a material element. He asserts that under the circumstances of this case he had a right to defend himself, and that therefore the trial court's refusal to instruct that self-defense applies to felony-murder was prejudicially erroneous. We disagree.

Appellant sets forth the novel proposition that in the present case, viewing the record as a whole, the jury could clearly have found a set of facts to which the defense of self-defense would have been applicable. Appellant posits the following:

Had appellant schemed to get Lynch so drunk that he could not resist the taking of his money, and to use unarmed force to accomplish this aim, the offense of robbery would have been well underway. Had Lynch then picked up a heavy metal object, turned the tables upon appellant, and threatened to kill him, it would be completely unreasonable to expect appellant to simply stand by and be killed.

Assuming the truth of this language set forth in appellant's brief, it clearly concedes that appellant was engaged in a robbery of Lynch. It attempts to establish appellant's theory that the use of any force by the victim in a robbery to protect his or her self would now make the victim the aggressor. The premises of an accused being permitted to raise the defense of self-defense to the charge of robbery borders on the absurd, and is a variation of the old shibboleth of the individual who murders both his parents and then throws himself on the mercy of the court as an orphan. We reject such reasoning by the "orphan" in this case. Further, nowhere in his factual scenario is there any basis for a jury to find that appellant abandoned his criminal activity. Is the jury to assume that he abandoned his initial desire to deprive permanently the victim of his money? Or that he was actually replacing the money back into the victim's pocket?

It has been established that self-defense is not a defense to felony murder. *See Roach v. State*, 358 Md. 418, 429, 749 A.2d 787 (2000) (quoting *State v. Faulkner*, 301 Md. 482, 483 A.2d 759, 761 (1984)). In *Faulkner* it was stated that the elements required to justify a homicide, *other than felony murder*, on the basis of self defense are:

(1) The accused must have had reasonable grounds to believe himself [or herself] in apparent imminent or immediate danger of death or serious bodily harm from his [or her] assailant or potential assailant;

(2) The accused must have in fact believed himself [or herself] in this danger;

*(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict;* and

(4) The force used must have not been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*Id.* at 485, 483 A.2d 759 (emphasis supplied).

Although *Roach* clearly is a homicide case, the fundamental concept that the accused claiming the right of self-defense must not have been the aggressor or provoked the

conflict is set forth in *Street v. State*, 26 Md.App. 336, 338 A.2d 72 (1975). There, the victim was shot and killed in an alley. A witness testified that appellant and he accosted the victim and forced him into the alley; that appellant at gunpoint demanded and was given money by the victim; that he, (the witness) took the victim's wallet from his back pocket and left the alley. Shortly thereafter he heard a shot and saw appellant run from the alley. Approximately twenty to twenty-five minutes later he saw appellant and asked him why he shot the man; that appellant said, "because the man had pulled out some scissors on him." A pair of scissors was found with the victim's clothing. This Court stated:

> The only evidence of self-defense in the instant case is appellant's self-serving declaration to Roberts, that he shot the man "because the man had pulled out some scissors on him." Surely, this meager shred of evidence was too slight and doubtful in this fact situation to raise the issue of self-defense for jury consideration.
>
> * * * * *
>
> In addition to lacking factual support in the record to generate the issue of self-defense for jury consideration, *the claim of self-defense was unavailable to appellant as a matter of law because he was an aggressor engaged in the perpetration of a robbery.*

*Id.* at 339–340, 338 A.2d 72 (emphasis added).

Other jurisdictions have reached similar conclusions. *See Commonwealth v. Foster*, 364 Pa. 288, 292, 72 A.2d 279 (1950): "We say to you also that the persons perpetrating the robbery had no rights under the law to defend themselves, no right to injure anyone in self-defense. If they staged a robbery, they lost the legal right which law-abiding citizens have to defend themselves." *Smith v. Tennessee*, 209 Tenn. 499, 503, 354 S.W.2d 450 (1961): ". . . the person who kills another while engaged in committing a felony cannot escape conviction from murder in the first degree, by showing that his intent was not to kill, but to defend his own life or person . . . ." and *Wilson v. Georgia*, 215 Ga. 672, 676–77, 113 S.E.2d 95 (1960):

Resistance by armed force of an attempt by the defendant to commit robbery upon Lewis would be justifiable ... and the defendants could not claim self-defense in defending themselves.... In an alleged situation requiring the killing of another in self-defense, one cannot create an emergency which renders it necessary for another to defend himself and then take advantage of the effort of such other person to do so.... There is no merit in this ground.

(Citations and internal quotation marks omitted.)

Arguably, the State had sufficient evidence to pursue this case under a murder theory, but apparently chose against it in order to negate an opportunity by appellant to claim self-defense. We find that such strategy in this case proved to be prudent. Appellant concedes that the relevant case law propounds that "a person in the actual act of committing a robbery cannot kill and then claim self-defense," but claims that "the jury in the present case could have found a very different set of facts." We disagree.

▮ The jury was actually given the opportunity to find a "very different set of facts," but, quite frankly, did not find such to be the case. This is because of the jury instructions that were given regarding the charge of first degree assault. The jury was told that self-defense could apply to the charge of first degree assault, and was properly instructed as to the elements of self-defense regarding that charge. Nonetheless, the jury rejected appellant's claim of self-defense, evidenced by appellant's conviction of first degree assault. The assault charge and the robbery/felony murder charges were based on the same incident. Appellant established through his testimony at trial that there was but one altercation between Lynch and himself. It logically follows that, as the jury rejected appellant's claim of self-defense pertaining to the assault, it likewise would have rejected appellant's claim of self-defense for any of the other charges pertaining to this incident, specifically as it pertained to felony murder and the underlying robbery. Thus, we find it important to point out that even assuming that the trial court erred in failing to instruct the

jury that self-defense was applicable to felony murder, any such error was harmless beyond a reasonable doubt.

## VI. Second-degree murder and manslaughter

 Appellant's final contention is that the trial court erroneously refused to instruct the jury on second-degree murder and manslaughter. While appellant was initially charged with all forms of murder, the State elected to proceed only upon first-degree felony murder. Appellant argues that the obvious purpose of this tactic was to obtain a conviction upon a charge to which, in its view, self-defense did not apply. Appellant responded by submitting proposed jury instructions covering other and lesser forms of criminal homicide. Appellant submits that the trial court erroneously rejected those submissions on the basis of the State's election to proceed solely upon felony murder.

Appellant claims that it was error to present the jury with an all-or-nothing choice respecting criminal homicide, and that this parallels the issue before the Court of Appeals in *Hook v. State*, 315 Md. 25, 553 A.2d 233 (1989). In *Hook*, a homicide had clearly been committed, but evidence of voluntary intoxication would have permitted the jury to rationally return a verdict of murder in the second degree. The State elected to proceed only with first-degree murder (both premeditated and felony), and the trial court over objection declined to mention to the jury in any way the existence of the lesser crime of murder in the second degree. The State nol prossed the second degree murder charge, and Hook was subsequently convicted of first-degree murder. The Court of Appeals reversed on the basis that the all-or-nothing option deprived Hook of fundamental fairness.

In *Hook*, voluntary intoxication was an issue at trial, but the jury was put in a position where it could not convict of a lesser crime even if it found voluntary intoxication applicable. Instead, the jury was faced with "a Hobson's choice" of either convicting on first degree murder or acquitting of homicide completely. The Court stated: "it is require[d] that a lesser

included offense instruction be given when the evidence warrants such an instruction, but *only* in such circumstances. The jury's discretion is thus channeled so that it may convict a defendant of any crime *fairly supported by the evidence.*" *Id.* at 40, 553 A.2d 233. (emphasis added).

The situation is different in the present case. As discussed above, voluntary intoxication was not an issue generated by the evidence in this case, and appellant did not even request such an instruction. Likewise, contrary to appellant's assertion, the evidence did not support mutual affray, nor was such an instruction requested. Nor, as discussed above, is self-defense a defense to felony murder. Thus, there was absolutely no reason to instruct the jury on second degree murder or manslaughter, which were crimes the State was not accusing appellant of having committed. "It is beyond dispute that a defendant is not entitled to a lesser-included offense instruction unless the evidence adduced at the trial provides a rational basis upon which the jury could find him not guilty of the greater but guilty of the lesser offense." *Dishman,* 352 Md. at 293, 721 A.2d 699.

Furthermore, "[t]he clear holding of *Hook* establishes a limitation on the State's prerogative to *nol pross* a charge only when that charge is a lesser included offense within a greater inclusive offense that is being submitted to the jury." *Dixon v. State,* 133 Md.App. 325, 354, 755 A.2d 560, *cert. granted,* 361 Md. 433, 761 A.2d 932 (2000). It is clear that neither second degree murder nor manslaughter is a lesser included offense of felony murder.

We find no error by the trial court regarding its refusal to instruct the jury on any additional forms of homicide.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY APPELLANT.**