*Malik Dujuan Jefferson v. State of Maryland*, Case No. 509, Sept. Term, 2024, Opinion filed on January 29, 2026, by Berger, J.

CRIMINAL LAW – DEFENSE OF OTHERS – AGGRESSION OR PROVOCATION BY PERSON CLAIMING DEFENSE

A third party may intervene to defend an individual being attacked with the same level of force as the attacked individual could lawfully use in their own defense. Although one who initiates a fight is generally not entitled to claim self-defense, a non-deadly aggressor who is met with deadly force in defense may lawfully defend themselves against the deadly attack. A third party, therefore, is equally entitled to intervene to defend a non-deadly initial aggressor who is met with deadly force in response.

CRIMINAL LAW – STATEMENTS, CONFESSIONS, AND ADMISSIONS BY ACCUSED – WAIVER OF RIGHTS

A criminal defendant's waiver of rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) must be knowing, intelligent, and voluntary. Pursuant to *Colorado v. Spring*, 479 U.S. 564 (1987), a *Miranda* waiver may still be valid where a defendant is not informed of all information that may affect their decision to confess. Accordingly, law enforcement's failure to inform a defendant of the charges lodged against them prior to obtaining a *Miranda* waiver does not render a waiver involuntary, provided that the defendant was aware that incriminating statements could be used against them.

Circuit Court for Montgomery County
Case No. C-15-CR-22-000277

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 509

September Term, 2024

_____

MALIK DUJUAN JEFFERSON

v.

STATE OF MARYLAND

_____

Wells, C.J.,
Berger,
Lazerow, Alan C.
    (Specially Assigned),

JJ.

_____

Opinion by Berger, J.

_____

Filed: January 29, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

On February 17, 2022, Appellant Malik Dujuan Jefferson ("Jefferson") accompanied Jackson Alexander Garcia ("Garcia") to purchase marijuana from Jose Osvaldo Genao Romero ("Genao") in Rockville. After picking up Genao, who was wearing a Louis Vuitton crossbody bag, from his residence, Garcia drove Jefferson and Genao to a nearby neighborhood where an altercation ensued. As the altercation spilled out of the vehicle and on to the street, Jefferson stood by as Garcia and Genao tussled. At some point, Jefferson fired a single fatal shot that killed Genao. Thereafter, Jefferson and Garcia fled the scene.

A few days later, Jefferson was arrested for first-degree murder. A Louis Vuitton crossbody bag matching the one Genao was wearing on February 17 was recovered from Jefferson's bedroom. Detectives Eric Glass ("Detective Glass") and Peter Marable ("Detective Marable," collectively "the Detectives") questioned Jefferson shortly after his arrest. The Detectives informed Jefferson that a warrant had been issued for his arrest and indicated that they arrested Garcia the day before and wanted Jefferson's side of the story. During the hour-and-a-half long interview, Jefferson confessed to shooting Genao, but stated he had only done so when it seemed like Genao was going to hurt or kill Garcia. Jefferson also told the Detectives that he had given the firearm back to Garcia after the shooting. It was not until after Jefferson confessed that the Detectives informed him that he had been charged with first-degree murder.

Jefferson was tried for first-degree murder, robbery with a dangerous weapon, conspiracy to commit armed robbery, and use of a firearm in the commission of a crime of violence in the Circuit Court for Montgomery County. At trial, the State urged the jury to

find that Jefferson and Garcia had planned to steal marijuana from Genao and that the subsequent homicide was both deliberate and pre-meditated. Among other things, the State introduced into evidence, over objection, a redacted version of Jefferson's custodial interrogation. Additionally, over objection, the State's firearm and toolmark examiner testified that markings on cartridge casings and bullets test fired from the firearm recovered from Garcia's person upon his arrest were "consistent" with markings on the ballistics evidence. Jefferson argued that he was acting in defense of Garcia when he shot Genao, and requested that the trial court instruct the jury on both perfect and imperfect defense of others. The trial court refused to give the requested instructions and the jury subsequently returned a verdict convicting Jefferson of second-degree murder, use of a firearm in the commission of a crime of violence, and robbery.

On appeal, Jefferson presents three questions for our review, which we have rephrased as follows:[1]

    I.    Whether the trial court erred by not instructing the jury on perfect and imperfect defense of others.

---

[1] Appellant phrased the questions as follows:

    1. Did the trial court commit reversible error by refusing to instruct the jury on perfect and imperfect defense of others?

    2. Did the trial court commit reversible error by permitting the jury to hear Jefferson's statements made to interrogators even though Jefferson's waiver of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) was not knowing, intelligent, and voluntary?

    3. Did the trial court commit reversible error by permitting the State's firearm expert to testify that firearms possess "unique" and "individual" markings, and that the

II. Whether the trial court erred by admitting statements made by Jefferson to police while in custody after he was read his *Miranda* rights, but before he was informed of the underlying charges.

III. Whether the trial court abused its discretion by admitting expert testimony from the State's firearm and toolmark examiner opining that firearms possess "unique" and "individual" markings, and that the "individual marking" on evidentiary bullets and cartridge cases recovered from the crime scene were "consistent with" the "individual characteristics" of test fired bullets and cartridge cases.

For the following reasons, we shall vacate the judgments of conviction and remand for further proceedings consistent with this opinion.

## BACKGROUND

### *The Arrest and Police Interview*

On the evening of February 17, 2022, police and paramedics responded to a reported shooting at the intersection of Bradley Avenue and Fletcher Place in Rockville. Upon arrival, police and paramedics found Genao with gunshot wounds in his elbow and lower abdomen. Genao was quickly transported to the hospital where he was later pronounced dead. As police swept the scene they found, among other things, a large kitchen knife in its sheath with Genao's DNA on the handle, a shell casing, and blood.

---

"individual markings" on one bullet/casing from the test fire were consistent with the "individual characteristics" of the bullet/casing that was found at the crime scene, in violation of *Abruquah v. State*, 483 Md. 637 (2023)?

3

On February 21, 2022, the State charged Jefferson with first-degree murder for the February 17 shooting of Genao. On February 22, 2022, Jefferson was arrested pursuant to a warrant by Detective Rick Hillman ("Detective Hillman"). Detective Hillman informed Jefferson that he was being arrested pursuant to a warrant, but did not inform him of the specific charges for which he was being arrested. Jefferson asked Detective Hillman if the warrant was "from what happened on the Metro" and Detective Hillman told him it was not. Detective Hillman advised Jefferson that the Detectives who had obtained the warrant would "speak with him about why he had the arrest warrant." The rest of the ride to the Montgomery County Police headquarters ("the station") was silent.

Upon arriving at the station, Detective Hillman placed Jefferson in an interview room alone. Approximately an hour-and-a-half later, Detective Glass and Detective Marable arrived. Without advising Jefferson of the charges underlying the warrant, the Detectives asked Jefferson biographical questions and advised him of his *Miranda* rights. Jefferson stated that he understood the *Miranda* rights given to him and signed a form to that effect. The Detectives then proceeded to question Jefferson about the events of February 17, 2022. Jefferson ultimately confessed to shooting Genao after witnessing a fight between Genao and Garcia that was getting "tragic." Jefferson also confessed to taking a Louis Vuitton crossbody bag that he thought may have been Garcia's, but which turned out to be Genao's. It was not until after Jefferson confessed that the Detectives informed him that he was being charged with first-degree murder.

Subsequently, Jefferson was indicted by the Grand Jury for Montgomery County for first-degree murder, use of a firearm in the commission of a crime of violence, armed robbery, and conspiracy to commit armed robbery.

***Pre-Trial Motions***

Prior to trial, Jefferson moved to suppress the statements he made to the Detectives on February 22, 2022, arguing that his *Miranda* waiver was not voluntary and knowing because he had not been informed of the pending first-degree murder charge and that the statements themselves were also involuntary. Detective Glass testified at the suppression hearing. Jefferson elected not to testify at the hearing. The trial court summarily denied Jefferson's motion, finding that Jefferson's *Miranda* waiver was voluntary and that "[n]one of the Detective's statements to [Jefferson], directly or indirectly, suggested or implied that anything [Jefferson] might say would not be used against him." Further, the trial court announced that its review of the video-recorded interview led it to be satisfied that Jefferson "fully understood the *Miranda* warnings and that his election to speak with Detective Glass was a choice that he made freely, knowingly, intelligently and voluntarily." The trial court went on to note that it had also considered that Jefferson "was not yet served with the arrest warrant or expressly advised of the serious charge that had already been lodged against him," but concluded that "the failure to advise [Jefferson] specifically of the charge, while a consideration, does not, standing alone, render [Jefferson's] statement involuntary."

Prior to trial, Jefferson also moved to limit the State's firearm and toolmark examiner's ("the firearm examiner") testimony. Specifically, Jefferson argued that "[t]he

5

opinion that a *specific* bullet or cartridge case can be 'matched' or 'identified' to a *specific* gun" is "unreliable and inadmissible" under *Abruquah v. State*, 483 Md. 637 (2023). The trial court granted the motion "as related to testimony that the fired ammunition matched a particular firearm," but denied the motion "as related to the specific use of the terms 'unique' or 'individual' when referring to particular markings."

### *The Trial*

At trial, precisely what happened on the evening of February 17, 2022, was subject to dispute. Jefferson did not testify at trial. The State relied heavily on the statements that Jefferson made during his custodial interview and footage obtained from a Ring doorbell camera ("Ring footage") that captured parts of the altercation.[2]

According to the State, on the evening of February 17, 2022, Garcia and Jefferson acted on a plan to steal marijuana from Genao. Garcia picked up Jefferson near Aspen Hill, then the two men drove to Genao's apartment complex in Rockville. Genao came out wearing a Louis Vuitton crossbody bag. The three men then drove a short distance to a nearby neighborhood where, around the intersection of Fletcher Avenue and Bradley Place, Garcia made a sharp U-turn and then stopped the vehicle. Thereafter, Garcia exited the vehicle and Jefferson quickly followed. After briefly inspecting something near the back license plate or bumper, Garcia and Jefferson opened the back door to the vehicle and

---

[2] There was about a minute where there was insufficient activity to cause the motion detector of the Ring doorbell camera to work. As a result, the Ring video cut out when Jefferson and Garcia were interacting with Genao in the back seat of the vehicle and came back on to show Genao's body on the ground in the street and Jefferson and Garcia standing over him.

began attacking Genao. During the tussle, either Garcia or Jefferson grabbed something from Genao and tossed it into the front seat. The altercation eventually spilled onto the street and Jefferson shot Genao in the elbow. After shooting Genao, Jefferson and Garcia fled the scene and Jefferson gave the firearm to Garcia.

Defense counsel's theory, on the other hand, was that Jefferson had acted in defense of Garcia when he shot Genao. Defense counsel highlighted Jefferson's custodial statements, which were introduced into evidence. Specifically, Jefferson stated he was not involved in the altercation between Garcia and Genao that spilled onto the street, but that Genao shoved Jefferson when exiting the vehicle. Further, Jefferson described how the altercation between Genao and Garcia escalated, noting that Genao "tried to slam [Garcia's] head on the ground" and it looked as if Genao was trying to kill Garcia. Jefferson also indicated that Genao "had a knife on him" that he kept reaching for and that Genao was "bigger than [Garcia]." According to Jefferson, it was only when the altercation "was getting tragic" that he picked up Garcia's gun, which Garcia had dropped by the vehicle and shot Genao a single time in the elbow. Moreover, defense counsel argued that the robbery occurred not when Jefferson and Garcia joined Genao in the back seat of the vehicle, but after Genao had been shot when Garcia grabbed something from Genao's person.

The State also introduced evidence, through the testimony of its firearm examiner, linking the firearm recovered from Garcia's person upon his arrest to the homicide. Specifically, the State's firearm examiner testified, over objection, that "[a]ll firearms possess individual markings that make it unique to that firearm" and that such "individual

7

characteristics" can "tell[] [the firearm examiner] if it's John Doe's gun." The firearm examiner went on to explain that she had fired test shots from the firearm that was recovered from Garcia and compared the test fired cartridge cases and bullets with the ballistics evidence. The firearm examiner then opined that the markings from the test firing were "consistent" with the "class[] characteristics" and "individual characteristics" of the evidence cartridge case and bullet.

### *Jury Instructions and the Resulting Verdict*

At the close of evidence, Jefferson requested both a perfect and imperfect defense of others instruction (collectively, "defense of others instruction"). Jefferson argued that there was sufficient evidence to generate such instructions, including his custodial statements that Genao tried to slam Garcia's head on the pavement, that Genao was reaching for his knife, that Genao was much larger than Garcia, and that Jefferson thought Genao was going to hurt or kill Garcia.

The State opposed Jefferson's request, arguing that, because there was insufficient evidence for the jury to conclude that neither Garcia nor Jefferson was the initial aggressor or that Jefferson subjectively believed Garcia was about to die, there was insufficient evidence to generate the defense of others instruction. Jefferson countered that concluding that a defense of others instruction was inapplicable to the facts of the case because Garcia was the initial aggressor would require interpreting all of the evidence in the State's favor. Further, Jefferson argued that, even if Garcia was the initial aggressor, there was sufficient evidence from which the jury could conclude that Genao escalated the altercation to the deadly level.

8

The trial court agreed with the State and refused to give the defense of others instruction. The trial court reasoned that, because Garcia and Genao were engaged in mutual combat, which Garcia had initiated, neither defense of others instruction was applicable to Jefferson.

Thereafter, the jury was instructed on, among other things, first-degree murder, first-degree felony murder, and second-degree murder. While deliberating, the jury sent two notes inquiring about the availability of lesser homicide charges. The first note asked: "Are there any lesser homicide charges available?" The trial court responded that "[t]he homicide charges available in case are those listed on the verdict sheet: First Degree Murder[;] Second Degree Murder." That same day, the jury sent a second note asking "is homicide/killing someone in defense of another person's life considered murder on its own?" The trial court responded: "You must rely on the law as stated in the instructions given." The jury returned a verdict convicting Jefferson of second-degree murder, use of a firearm in the commission of a crime of violence, and robbery. Jefferson noted a timely appeal. We shall include additional details as necessary.

## DISCUSSION

I. **The trial court erred by not instructing the jury on perfect and imperfect defense of others because Jefferson adduced "some evidence" that he was acting in the defense of Garcia when he shot Genao.**

On appeal, Jefferson contends that the trial court erred by refusing to instruct the jury on perfect and imperfect defense of others because his statements to the Detectives, which were played for the jury, if believed, were sufficient to support the legal theory that he acted in Garcia's defense. Moreover, Jefferson asserts that the trial court's conclusion

9

that Garcia was the initial aggressor and, as a result, a defense of others instruction was unwarranted, improperly usurped the jury's role as trier of fact. The State concedes that the trial court was required to instruct the jury on perfect and imperfect defense of others but argues that such error was harmless beyond a reasonable doubt. As we shall explain, we agree with Jefferson and the State that the trial court erred in not instructing the jury on defense of others. Further, based on our review of the record, we hold that the error was not harmless beyond a reasonable doubt.

**A.      Jefferson was entitled to a jury instruction on perfect and imperfect defense of others.**

"The main purpose of jury instructions 'is to aid the jury in clearly understanding the case, to provide guidance for the jury's deliberations, and to help the jury arrive at a correct verdict. Jury instructions direct the jury's attention to the legal principles that apply to the facts of the case.'" *Dickey v. State*, 404 Md. 187, 197 (2008) (quoting *General v. State*, 367 Md. 475, 485 (2002)).

In criminal cases, Maryland Rule 4-325(c) ("Rule 4-325(c)) governs: "The court may, and at the request of any party shall, instruct the jury as to applicable law and the extent to which instructions are binding. . . . The court need not grant a requested instruction if the matter is fairly covered by instructions actually given." Rule 4-325(c) has been interpreted to require trial courts to give a requested instruction to the jury when: "(1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere in instructions actually given." *Dickey*, 404 Md. at 197-98 (citing *Thompson v. State*, 393 Md. 291, 302-

10

03 (2006)).  We review the trial court's overall determination that a jury instruction is not warranted "for an abuse of discretion, but the second requirement (whether the instruction is applicable in that case) is akin to assessing the sufficiency of the evidence, which requires a *de novo* review."  *Danshin v. State*, 491 Md. 520, 532 (2025) (quoting *Jarvis v. State*, 487 Md. 548, 564 (2024)).

Here, there is no dispute that the requested defense of others instruction was a correct statement of law[3] that was not covered elsewhere in the instructions provided to the jury.  Therefore, the only issue is whether the instruction was, in fact, applicable to the facts adduced at trial.  "In order for a jury instruction to be applicable under the facts of a particular case, '[t]he requesting party must only produce "some evidence" to support the requested instruction, and this Court views the facts in the light most favorable to the requesting party.'"  *Id.* at 533 (quoting *Rainey v. State*, 480 Md. 230, 255 (2022)).  In other

---

[3] The Supreme Court of Maryland recently recognized that there is a discrepancy between this Court's recitation of the first element of perfect defense of others and the corresponding pattern jury instructions.  *Danshin*, 491 Md. at 538-39.  Specifically, this Court has repeatedly recited the first element as "the defendant actually believed that the person defended was in immediate *and* imminent danger of bodily harm" while the pattern jury instructions state "immediate *or* imminent."  *Id.* (comparing *Joiner v. State*, 265 Md. App. 546, 563 (2025), *Dishman v. State*, 118 Md. App. 360, 377 (1997), *Choi v. State*, 134 Md. App. 311, 326 (2000), *Lee v. State*, 193 Md. App. 45, 56-57 (2010), and *Robinson v. State*, 209 Md. App. 174, 206 (2012) with Crim. Pattern Jury Instructions 5:01 (Md. Bar. Ass'n 2024)).  Because neither party in *Danshin* disputed that the jury instruction requested -- which was a verbatim recitation of the pattern jury instruction -- was a correct statement of the law, the Supreme Court of Maryland declined to opine on the discrepancy and instead assumed, without deciding, that the pattern jury instruction was a correct statement of law.  *Id.* at 539 & n.13.  The parties in this case do not dispute that "immediate *or* imminent" is a correct recitation of the first element of perfect defense of others.  Therefore, we shall similarly assume, without deciding, that the pattern jury instruction requested is a correct statement of the law.

11

words, in the context of an instruction on perfect and imperfect defense of others, a defendant need only produce "'some evidence' on the issue of mitigation or [defense of others] . . . sufficient to give rise to a jury issue."[4] *Dykes v. State*, 319 Md. 206, 215 (1990) (quoting *Simmons v. State*, 313 Md. 33, 39-40 (1988)).

The so-called "some evidence" requirement is not a high bar. *Hollins v. State*, 489 Md. 296, 311 (2024) (quoting *Arthur v. State*, 420 Md. 512, 526 (2011)) (describing the "some evidence" standard as a "fairly low hurdle" for a defendant). Rather, as the Supreme Court of Maryland recently reiterated:

> *Some evidence* is not strictured by the test of a specific standard. It calls for no more than what it says—"some," as that word is understood in common, everyday usage. It need not rise to the level of "beyond a reasonable doubt" or "clear and convincing" or "preponderance." The source of the evidence is immaterial; it may emanate solely from the defendant. It is of no matter that the [defense of others] claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support [the defendant's] claim that [they] acted in [defense of others], the defendant has met [their] burden.

*Danshin*, 491 Md. at 533 (quoting *Dykes*, 319 Md. at 216-17) (emphasis in original). "Some evidence" of each element of a defense is required "for a defendant to be entitled to have the jury so instructed." *Id.* (citing *Jarvis*, 487 Md. at 564). We, therefore, must

---

[4] In assessing whether sufficient evidence has been adduced to generate a defense of others instruction, Maryland courts are guided by the same analysis employed in self-defense cases. *See, e.g.*, *Danshin*, 491 Md. at 541-50 (analyzing whether some evidence as to each element of the defense of others defense was adduced using both self-defense and defense of others cases as guidance); *Lee*, 193 Md. App. at 59 (explaining that Maryland generally follows the common law rule, which allowed a third person to intervene and defend another using "the same degree and character of force that the one attacked could have used").

determine whether "some evidence" of each element of the defense of others defense was adduced at trial.

### 1. *The elements of a defense of others defense*

Defense of others can be either perfect or imperfect. *Lee*, 193 Md. App. at 59-60. The former is a complete defense, which results in acquittal. *Id.* The latter, however, is only a partial defense which mitigates murder to manslaughter. *Id.* To generate a perfect defense of others instruction, the defendant must produce "some evidence" to support each of the following:

> (1)    the defendant actually believed that the person defended was in immediate [or] imminent danger of death or serious bodily harm;
>
> (2)    the defendant's belief was reasonable;
>
> (3)    the defendant used no more force than was reasonably necessary to defend the person defended in light of the threatened or actual force; and,
>
> (4)    the defendant's purpose in using force was to aid the person defended.

*Choi*, 134 Md. App. at 326 (citation omitted). Conversely, where a defendant shows that they "held an actual belief that [they] had to use force to defend another," an imperfect defense of others instruction is generated, even if the defendant's "belief was not objectively reasonable and/or the level of force [the defendant] used was not objectively reasonable." *Lee*, 193 Md. App. at 59 (citation omitted). We conclude that there was "some evidence" of each element so as to generate a defense of others instruction.

13

First, there was sufficient evidence which, if believed, could have led the jury to find that Jefferson, either reasonably or unreasonably, believed that Garcia was in immediate or imminent danger of death or serious bodily harm. Indeed, the jury heard Jefferson's statements to the Detectives after his arrest in which he explained what had happened. For example, Jefferson told the Detectives that Genao "shoved [Garcia] down, like, tried to slam his head on the ground." Further, Jefferson stated that the fight "didn't look like -- it wasn't like a regular fight, it looked like [Genao] was trying to hurt [Garcia]," or kill him. Jefferson also indicated that the fight seemed "like[] it was getting tragic" and that it appeared to be "the fight of [Garcia's] life." Moreover, the jury heard that Genao was much bigger than Garcia and that Genao had a large kitchen knife on him, which he kept reaching for. Finally, the jury saw evidence that a kitchen knife in its sheath, which had Genao's DNA on the handle was recovered at the scene. Such evidence satisfies the "some evidence" requirement.

Second, the jury could have concluded that Jefferson used either a reasonable or unreasonable level of force against Genao. Indeed, the jury was presented with evidence that Genao had a large kitchen knife on him, that Genao was trying to "slam [Garcia's] head on the ground," and that Jefferson thought the fight between Genao and Garcia "was getting tragic." There was, therefore, sufficient evidence of the third element of defense of others to generate the requested jury instruction.

Third, and finally, the jury heard Jefferson's statement to the Detectives that he only took Genao's Louis Vuitton crossbody bag because he thought it belonged to Garcia and that he never intended to rob Genao. This statement, along with those outlined above,

14

provided sufficient evidence to support Jefferson's claim that his purpose for using force against Genao was to aid Garcia, rather than to complete a robbery.

### 2.    *The innocent party requirement*

In addition to the four elements outlined above, a defendant requesting either a perfect or imperfect defense of others instruction must also adduce evidence that the person on whose behalf they intervened was an innocent party; that is that the person defended was "not the initial deadly aggressor or the person who escalated the [confrontation] to the deadly level." *Lee*, 193 Md. App. at 58 n.8 (citation omitted) (discussing this requirement in the self-defense context). On appeal, Jefferson contends that whether Garcia was the initial aggressor and whether Genao escalated the confrontation to the deadly force level were questions for the jury, and that the trial court erred in resolving those factual issues in the State's favor. The State agrees with Jefferson that it was the jury's role to resolve the factual discrepancies. We agree with Jefferson and the State and conclude that the trial court erroneously usurped the jury's role as factfinder.

At trial, there was significant disagreement over whether Jefferson was legally entitled to intervene to defend Garcia. The State argued that the requested defense of others instruction was inapplicable because Garcia was the initial aggressor. The State's theory was that the Ring footage suggested that Garcia initiated the altercation by robbing Genao in the back seat of the vehicle. The State, therefore, reasoned that Jefferson was not legally entitled to a defense of others instruction. Jefferson countered that his statements to the Detectives supported the theory that Genao escalated the confrontation from non-deadly to deadly force by trying "to slam [Garcia's] head on the ground" and "reaching for" his knife.

15

Because of this escalation, Jefferson reasoned that he was entitled to intervene. Moreover, Jefferson argued that whether Garcia was the initial aggressor was an issue of fact for the jury -- not the court -- to decide. The trial court was not persuaded that Jefferson regained the defense when Genao escalated the fight to the deadly force level and instead agreed with the State that Jefferson was not entitled to the requested defense of others instruction. The trial court reasoned that, because Garcia was the initial aggressor and was engaged in mutual combat, Jefferson was not entitled to choose a side and intervene.[5]

Maryland courts have frequently held that a third party may intervene to defend persons being attacked "in such a manner that [they] could properly have defended [themselves] by the use of force." *See, e.g.*, *Tipton v. State*, 1 Md. App. 556, 560 (1967). That is, if a defendant intervenes on behalf of a person knowing that person would not be

---

[5] As Jefferson correctly points out, the trial court initially relied on law that was not adopted by the Supreme Court when discussing whether Jefferson was entitled to the defense of others instruction. Indeed, the trial court extensively discussed *Belton v. State* for the proposition that:

> if two are engaged unlawfully in a mutual fight (deadly or nondeadly) the law does not authorize anyone (close relative or stranger) to take sides in the contest and aid in the effort to overcome his adversary . . . [o]bviously, the law does not authorize anyone to join forces with the offender and aid in harming the innocent victim.

253 Md. App. 403, 426 (2021), *aff'd in part, rev'd in part*, 483 Md. 523 (2023). After a brief recess, and prior to deciding whether to grant the defense of others instruction, counsel and the trial court realized their misguided reliance and noted the Supreme Court of Maryland's express mandate that this Court's discussion of defense of others in *Belton* "not be cited as authoritative in future cases." *Belton*, 483 Md. at 557. Although, as we explain, the trial court erred by refusing to give the requested defense of others instruction, we note that the trial court did not, in fact, rely on *Belton* in so doing.

entitled to act in self-defense, then the defendant is not entitled to claim defense of others. *See, e.g.*, *id.* Although one who initiates a fight is generally not entitled to claim self-defense, our Court has held that "[a] nondeadly aggressor (i.e., one who begins an encounter, using only his fists or some nondeadly weapon) who is met with deadly force in defense may justifiably defend himself against the deadly attack. This is so because the aggressor's victim, by using deadly force against nondeadly aggression, uses unlawful force." *Watkins v. State*, 79 Md. App. 136, 139 (1989) (citation omitted); *see also Tipton*, 1 Md. App. at 560. As a result, even if Garcia was the initial aggressor at the non-deadly level, if Genao escalated the fight to deadly force, Jefferson would have been entitled to intervene.

Moreover, the questions of whether Garcia was the initial aggressor and whether Genao escalated the fight to the level of deadly force were questions of fact squarely within the jury's role as factfinder to resolve. Indeed, "[f]rom time immemorial, the assessment of testimonial credibility has always been the fundamental responsibility of the factfinder, jury or trial judge, as a matter of fact." *Rothe v. State*, 242 Md. App. 272, 283 (2019). As discussed *supra*, there was "some evidence" which, if believed, could lead the jury to conclude that Genao escalated the fight to the deadly force level.

Further, there was "some evidence" that it was Genao who was the initial aggressor. To be sure, Jefferson told the Detectives that he and Garcia drove to purchase marijuana from Genao and then the three men drove to another location. Jefferson did not explain how or why he and Garcia joined Genao in the back seat of the vehicle but stated that Genao "didn't have what [Garcia] needed. I guess [Genao] thought [Garcia] was trying to

17

finesse him[.]" Jefferson then stated that Garcia and Genao were "fussing" and Genao's "telling [Garcia] this and that. And then I think [Genao] hit [Garcia] and [Garcia] hit him back."

Ultimately, it was for the jury -- not the trial court -- to determine whether to credit Jefferson's version of events. As explained *supra*, the "some evidence" requirement is a low hurdle and the evidence can come solely from the defendant's statements. Whether Jefferson's statements were contradicted by other evidence is irrelevant. If the jury believed Jefferson's version of events, it could have concluded that Genao, not Garcia, was the initial aggressor. By refusing to give the defense of others instruction, the trial court usurped the jury's role as factfinder and instead resolved all factual inferences in favor of the State. Because Jefferson satisfied the "some evidence" requirement, he was entitled to a defense of others instruction that would allow the jury, not the court, to resolve the factual discrepancies.

**B.      The trial court's error was not harmless beyond a reasonable doubt.**

Having concluded that the trial court erred in refusing to give the requested defense of others instruction, we now turn to whether such error was harmless. When, in a criminal case, an appellant establishes error, we must reverse unless we are satisfied, "upon [our] own independent review of the record," that the error was harmless beyond a reasonable doubt. *Dionas v. State*, 436 Md. 97, 108 (2013) (quoting *Dorsey v. State*, 276 Md. 638, 659 (1976)). An error is harmless if it "in no way influenced the verdict" and "there is no reasonable possibility that the [error] complained of . . . contributed to the rendition of a guilty verdict." *Id.* (quoting *Dorsey*, 276 Md. at 659). Once an error has been established,

18

"the burden is on the State to show that the error was harmless beyond a reasonable doubt and did not influence the outcome of the case." *Gonzalez v. State*, 487 Md. 136, 184 (2024) (quoting *Perez v. State*, 420 Md. 57, 66 (2011)).

The State asks us to make multiple inferences as to which version of facts the jury credited in reaching its verdict. The State argues that, to reconcile the jury's verdict with the evidence, there can only be one factual scenario related to the robbery: that Jefferson and Garcia instigated the confrontation by robbing Genao in the back seat of the vehicle *before* the shooting. The jury acquitted Jefferson of first-degree murder,[6] robbery with a dangerous weapon ("armed robbery"), and conspiracy to commit armed robbery and convicted him of second-degree murder, use of a firearm in a crime of violence, and unarmed robbery. The State contends that, because robbery requires a finding that the subject property was taken by force or threat, there are only two factual scenarios that would support the robbery conviction.

The first scenario the State cites is the struggle in the back seat of the vehicle. The jury saw a video at trial which the State characterized as showing Jefferson and Garcia grabbing something from Genao and tossing it onto the front seat. The second possibility that the State outlines arises from Jefferson's statement to the Detectives that he saw the Louis Vuitton crossbody bag in the vehicle after the shooting, thought it might belong to Garcia, and took it. With the latter possibility, the State asserts that the only force possible

---

[6] The jury was instructed on first-degree murder, first-degree felony murder, and second-degree murder. The verdict sheet, however, listed only first-degree and second-degree murder.

19

would be the shooting. According to the State, had the jury credited the second factual scenario when concluding that Jefferson was guilty of robbery, it would have convicted him of *armed* robbery -- a charge to which Jefferson was acquitted. The State, therefore, reasons that the only way to reconcile the evidence with the jury's verdict is to conclude that the jury must have credited the first scenario and found that Jefferson and Garcia committed an unarmed robbery of Genao in the back seat of the vehicle before the altercation spilled out onto the street. In such a case, the State asserts, the jury necessarily concluded that Jefferson and Garcia were the initial aggressors. Because the jury concluded that Garcia and Jefferson were the initial aggressors, the State contends, the defense of others instruction would have been inapplicable to Jefferson. Accordingly, the trial court's erroneous refusal to give such instruction was harmless beyond a reasonable doubt.

Jefferson counters that the State's attempt to decipher the jury's factual conclusions related to the robbery conviction based on its verdicts on other counts is pure speculation that should be rejected. Moreover, Jefferson argues that the State fails to exclude, beyond a reasonable doubt, a third factual scenario, namely that the jury convicted Jefferson of afterthought robbery. Jefferson reasons that the jury was presented with evidence from which it could have determined that the robbery occurred when Garcia forcibly took Genao's bag from his person *after* Genao was shot. This scenario, unlike either of the State's purported scenarios, Jefferson argues, is consistent with the jury's acquittal of first-degree felony murder. Jefferson, therefore, asserts that the State has failed to carry its

20

burden of proving that the trial court's erroneous refusal to give the requested defense of others instruction was harmless beyond a reasonable doubt.

We decline the State's invitation to speculate as to which factual conclusions the jury accepted. Rather, our review of the record leads us to conclude that the jury could have concluded that the robbery occurred after Genao was shot.[7] In such a case, the trial court's error may well have affected the verdict because the jury could have found that defense of others was applicable. Indeed, the jury's notes during deliberation underscore this conclusion.[8] The jury sent two notes relevant to our analysis here. First, the jury sent a note asking "[a]re there any lesser homicide charges available?" Next, the jury sent a note asking, "is homicide/killing someone in defense of another person's life considered murder on its own?" Both notes indicate that the omission of the requested defense of others instruction may well have affected the jury's verdict. We, therefore, conclude that the trial court's refusal to give the requested defense of others instruction was not harmless beyond a reasonable doubt.

Because we conclude that there is a third possible robbery scenario to which defense of others would undoubtedly apply, we decline to address the State's attempt to establish a

---

[7] The State argues that there is no evidence to support the possibility that the jury convicted Jefferson of afterthought robbery because it was Garcia -- not Jefferson -- who took Genao's bag from his person after the shooting. We are not persuaded. Indeed, the jury was instructed on accomplice liability and under such a theory, the jury may well have concluded that Jefferson was guilty of afterthought robbery.

[8] "[T]he jury's behavior during deliberations," including "jury notes sent over the course of the jury's deliberations," are "a relevant factor in the harmless error analysis." *Dionas*, 436 Md. at 111 (citing *Hunter v. State*, 397 Md. 580, 596-97 (2007)).

21

per se rule that defense of others is unavailable to the instigator of a felony. Notably, however, the cases on which the State relies for this proposition are readily distinguishable from the present case.

Generally, "any act of the accused in violation of law and reasonably calculated to produce the occasion amounts to bringing on the difficulty and bars [the accused's] right to assert self-defense [or defense of others] as a justification or excuse for a homicide." *Street v. State*, 26 Md. App. 336, 340 (1975) (quoting 1 Wharton's Criminal Law & Procedure, 501 § 229 (12th ed. R. Anderson 1957)). We have stated, however, that "[a] nondeadly aggressor (i.e., one who begins an encounter, using only [their] fists or some nondeadly weapon) who is met with deadly force in defense may justifiably defend [themself] against the attack. This is so because the aggressor's victim, by using deadly force against nondeadly aggression, uses unlawful force." *Watkins*, 79 Md. App. at 139. The State argues that our cases have held that this exception does not apply to defendants who instigated a felony.

The State first cites *Street v. State* for the proposition that "the claim of self-defense [is] unavailable to [a defendant] as a matter of law [if the defendant] was an aggressor engaged in the perpetration of a robbery." 26 Md. App. at 339-40. In *Street*, we concluded that self-defense was inapplicable to the defendant's first-degree murder charge where the defendant had robbed the victim at gunpoint prior to shooting the victim. *Id.* at 337-41. The only evidence that the defendant had acted in self-defense was: (1) the defendant's statement that he shot the victim because the victim "had pulled out some scissors on him," and (2) "[a] pair of scissors [] found with the victim's clothing." *Id.* at 337-38. In *Street*,

22

therefore, the defendant was not a *nondeadly* aggressor because he initiated the altercation with a gun. In the present case, however, there is some evidence that, if Garcia was the initial aggressor, he was a nondeadly aggressor using only his fists. *Street*, therefore, does not preclude the possibility that defense of others was available to Jefferson even if the jury concluded that Garcia was the initial aggressor.

The State next cites *Nicholson v. State*, a case in which we held that the failure to give a self-defense instruction was harmless error "[b]ecause the jury was not permitted to acquit [the defendant] of second-degree felony murder on the basis of self-defense." 239 Md. App. 228, 243-45 (2018). In so holding, we noted the well-established law "that self-defense is not a defense to felony murder." *Id.* at 245 (quoting *Sutton v. State*, 139 Md. App. 412, 454 (2001)). *Nicholson*, however, is inapposite here because, as Jefferson correctly points out, he was *acquitted* of first-degree felony murder.

Finally, the State cites *Sutton v. State* and *Marquardt v. State* for the proposition that a robber is not permitted to use deadly force to protect himself (or, by extension, others) from a victim who resists the robbery. In *Sutton*, we affirmed the trial court's decision to instruct the jury that self-defense was applicable to the charge of first-degree assault, but not to felony murder. 139 Md. App. at 453. Although we rejected the argument that "the use of any force by the victim[s] in a robbery to protect [themselves] would now make the victim[s] the aggressor," we did so within the context of a felony murder charge. *Id.* at 454. Indeed, we underscored that "[i]t has been established that self-defense is not a defense to felony murder." *Id.* at 454 (citing *Roach v. State*, 358 Md. 418, 429 (2000)). Because Jefferson was acquitted of felony murder, *Sutton* is also inapposite.

23

*Marquardt* is also distinguishable, but for a different reason. In *Marquardt*, we concluded that the defendant, who admitted to breaking into the victim's apartment with a baseball bat, was not entitled to a self-defense instruction related to his second-degree assault charge. 164 Md. App. 95, 140 (2005), *overruled in part on other grounds by*, *Kazadi v. State*, 467 Md. 1 (2020). In that case, the defendant claimed he hit the victim with the baseball bat after the victim "ran at him, cursing," with what appeared to be a knife. *Id.* at 139. We explained that it was the victim -- not the defendant -- "who was entitled to defend himself," reasoning that, "even at the deadly force level . . . there is no duty to retreat if one is attacked in [their] own home." *Id.* at 140 (quoting *Redcross v. State*, 121 Md. App. 320, 328 n.4 (1998)). In *Marquardt*, therefore, the victim was acting with *lawful* force when he came running at the defendant with what appeared to be a knife.

In the present case, however, there was some evidence from which the jury could infer that Genao escalated the altercation by using *unlawful* deadly force. Accordingly, based on the record before us, we conclude that the trial court's error in refusing to give the requested defenses of others instruction was not harmless beyond a reasonable doubt.

## II. The trial court did not err by admitting statements Jefferson made during a custodial interrogation because Jefferson's *Miranda* waiver was valid.

To provide guidance to the trial court on remand, we now turn to the issue of whether the Detectives' failure to inform Jefferson that he had been charged with first-degree murder rendered his waiver of his *Miranda* rights invalid. Jefferson contends that, because he was not advised that he had been charged with first-degree murder, his *Miranda* waiver was not knowing, intelligent, and voluntary. Jefferson reasons that, without

24

knowing the charges lodged against him, his purported waiver was made without full

knowledge of the nature of his circumstances and the consequences of his waiver.  Further,

Jefferson asserts that the officers violated Maryland Rule 4-212(e)[9] by failing to inform

him of the charges against him, and that such a violation should be a weighty factor in the

voluntariness analysis.[10]   The State counters that whether Jefferson knew of the nature of

---

[9] Maryland Rule 4-212(e) provides:

> (e) Execution of Warrant -- Defendant Not in Custody.
> Unless the defendant is in custody, a warrant shall be executed
> by the arrest of the defendant.  Unless the warrant and charging
> document are served at the time of the arrest, the officer shall
> inform the defendant of the nature of the offense charged and
> the fact that a warrant has been issued.  A copy of the warrant
> and charging document shall be served on the defendant
> promptly after the arrest.  The defendant shall be taken before
> a judicial officer of the District Court without unnecessary
> delay and in no event later than 24 hours after arrest or, if the
> warrant so specifies, before a judicial officer of the circuit court
> without unnecessary delay and in no event later than the next
> session of court after the date of arrest.  The court shall process
> the defendant pursuant to Rule 4-216, 4-216.1, or 4-216.2 and
> may make provision for the appearance or waiver of counsel
> pursuant to Rule 4-215.

[10] In his reply brief, Jefferson urges us to adopt a per se rule excluding all custodial statements of defendants who have already been charged but who have not yet been informed of what those charges are.  Jefferson reasons that such custodial statements are obtained in violation of Maryland Rule 4-212(e).  Further, Jefferson contends that, though promptly superseded by statute, the reasoning employed in *Johnson* related to the prompt presentment requirement, now embodied in the latter half of Rule 4-212(e), warrants such a per se exclusionary rule.  *Johnson v. State*, 282 Md. 314 (1978), *superseded by statute*, MD. CODE ANN. CTS. & JUD. PROC. § 10-912, *as recognized in*, *Young v. State*, 68 Md. App. 121 (1986).  Because Jefferson raised this argument for the first time in his reply brief, we decline to consider it.  *See, e.g.*, *Jones v. State*, 379 Md. 704, 713 (2004) ("[A]n appellate court ordinarily will not consider an issue raised for the first time in a reply brief.").  Our conclusion, however, does not preclude Jefferson from timely raising this argument on remand.

the charges against him is irrelevant to the voluntariness of his *Miranda* waiver. Because Jefferson does not allege that police engaged in any intimidation, coercion, or deception, the State asserts Jefferson's *Miranda* waiver was knowing and voluntary. We agree with the State that Jefferson's *Miranda* waiver was valid, and, therefore, conclude that the trial court did not err in admitting Jefferson's custodial statements.

Our review of the denial of a motion to suppress evidence is confined "to what occurred at the suppression hearing. We view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion, here, the State." *Gonzalez v. State*, 429 Md. 632, 647 (2012) (quoting *Lee v. State*, 418 Md. 136, 148 (2011)). We uphold the motion court's factual findings "unless they are shown to be clearly erroneous." *Id.* (quoting *Lee*, 418 Md. at 148). "We, however, make our own independent constitutional appraisal, by reviewing the relevant law and applying it to the facts and circumstances of the case." *Id.* at 648 (quoting *Lee*, 418 Md. at 148-49).

A criminal defendant's confession made during a custodial interrogation is inadmissible "unless a law enforcement officer properly advised the defendant of the defendant's rights under *Miranda* and the defendant knowingly, intelligently, and voluntarily waived those rights." *Madrid v. State*, 474 Md. 273, 310 (2021) (citing *Gonzalez*, 429 Md. at 637). The inquiry into whether a *Miranda* waiver is valid has "two distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the

26

consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Gonzalez*, 429 Md. at 651-52 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)). The totality of the circumstances approach

requires an examination of "all the circumstances surrounding the interrogation," including the individual's "age, experience, education, background, and intelligence, and . . . whether [the individual] has the capacity to understand the warnings given [to them], the nature of [their] Fifth Amendment rights, and the consequences of waiving those rights."

*Id.* at 652 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979)).

Jefferson does not contend that his waiver was the product of intimidation, coercion, or deception. Accordingly, our analysis focuses on the second dimension of the *Miranda* waiver analysis, namely whether the waiver was "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* (quoting *Moran*, 475 U.S. at 421).

"[A] valid waiver does not require that an individual be informed of all information 'useful' in making [their] decision or all information that 'might . . . affect[t] [their] decision to confess.'" *Colorado v. Spring*, 479 U.S. 564, 576 (1987) (quoting *Moran*, 475 U.S. at 422) (third alteration in original). Indeed, in *Spring*, the United States Supreme Court rejected the defendant's claim that his *Miranda* waiver was invalid because law enforcement failed to inform during an interview about firearms violations that they would also question him about a homicide. *Id.* at 566-69.

27

The Court in *Spring* explained that the defendant's *Miranda* waiver was "knowingly and intelligently made" because he "understood that he had the right to remain silent and that anything he said could be used as evidence against him." *Id.* at 574. Knowledge of the consequence of not remaining silent -- that is that any statements made could be used against the defendant -- was sufficient to constitute a knowing waiver within the meaning of *Miranda*. *Id.* To be sure, the Court went on to state: "The Constitution does not require that a criminal suspect know and understand every possible consequence of a [*Miranda*] waiver[.]" *Id.* (citing *Moran*, 475 U.S. at 422). Rather, "additional information could affect only the wisdom of a *Miranda* waiver, not its essentially voluntary and knowing nature." *Id.* at 577.[11]

In *Alston*, we had occasion to apply the Supreme Court's holding in *Spring*. *Alston v. State*, 89 Md. App. 178, 182-85 (1991). There, officers initiated questioning about robberies in Anne Arundel County after obtaining a *Miranda* waiver from the defendant. *Id.* at 184. During the interrogation, however, the officers began questioning the defendant about a robbery in Baltimore County. *Id.* The defendant admitted that he

---

[11] The Supreme Court did note, however, that "[i]n certain circumstances, the Court has found affirmative misrepresentations by the police sufficient to invalidate a suspect's waiver of the Fifth Amendment privilege." *Id.* at 576 n.8 (citations omitted). Because the Court was "not confronted with an affirmative misrepresentation by law enforcement officials as to the scope of the interrogation," the Court declined to "reach the question whether a waiver of *Miranda* rights would be valid in such a circumstance." *Id.* Here, Jefferson does not contend that the Detectives' failure to inform him of the first-degree murder charge lodged against him prior to securing his *Miranda* waiver was an affirmative misrepresentation as to the scope of the interrogation. Accordingly, we express no opinion regarding whether a *Miranda* waiver would be invalid in the face of such an affirmative misrepresentation by law enforcement.

28

was involved in the Baltimore County robbery "and signed a statement to that effect." *Id.* On appeal, the defendant argued that his *Miranda* waiver was invalid because the officers failed to inform him of the "full scope of interrogation" at the outset. *Id.* at 182. Applying the Supreme Court's holding in *Spring*, we rejected the defendant's argument, reasoning that "the question whether [a defendant] knew of all of the subjects about which [they were] to be questioned is irrelevant to the question of whether [their] *Miranda* waiver was made knowingly, intelligently, and voluntarily." *Id.* at 184.

Similarly, in *Ratchford*, we rejected the defendant's argument that his *Miranda* waiver was invalid because officers did not inform him, prior to obtaining the waiver, that the subject of the questioning was a triple homicide. *Ratchford v. State*, 141 Md. App. 354, 365 (2001). Citing *Spring*, we reasoned that "[t]he law . . . does not compel such an advisement." *Id.*

Jefferson's attempts to differentiate *Spring*, *Ratchford*, and *Alston* are unavailing. Jefferson argues that, because he had already been charged with first-degree murder at the time of the interrogation, the Detectives' failure to inform him of the charges against him is relevant to the voluntariness inquiry. Although, as a factual matter, Jefferson is correct that the interrogations in *Spring* and *Ratchford* occurred prior to the respective defendants being charged, the timing of the interrogation was not critical to the holding in either case. Rather, the animating principle in *Spring*, which we were guided by in *Ratchford* and *Alston*, was precisely *which* potential consequences for which a defendant must be aware in order for their *Miranda* waiver to be valid. *See Spring*, 479 U.S. at 574. The Court in *Spring* concluded that knowledge of the consequence that flows from making incriminating

statements, that is, that such statements may be used against the defendant, was sufficient.

*Id.*

Jefferson further argues that *Alston* is distinguishable because the issue here is not whether Jefferson knew the "full scope" of the interrogation. Instead, Jefferson contends that he was never told a critical fact underlying the interrogation -- that there was a pending first-degree murder charge against him. In *Alston*, however, our conclusion that the defendant's *Miranda* waiver was valid was not dependent on the fact that he had been told *some*, but not *all*, of the potential subjects of the interrogation. *See Alston*, 89 Md. App. at 182-85. Rather, we explained that:

> *Miranda* specifically require[s] that the police inform a criminal suspect that [they] ha[ve] the right to remain silent and that anything [they] say[] may be used against [them]. *There is no qualification of this broad and explicit warning*. The warning, as formulated in *Miranda*, conveys to a suspect the nature of [their] constitutional privilege and the consequences of abandoning it.

*Id.* at 184 (quoting *Spring*, 479 U.S. at 577). Our conclusion in *Alston*, therefore, was again premised on the defendant's knowledge that making incriminating statements could lead to those statements being used against him.

Here, Jefferson does not claim -- nor could he -- that he was not aware that his incriminating statements could be used against him. The trial court denied Jefferson's motion to suppress, stating that "[n]one of the Detective's statements to [Jefferson], directly or indirectly, suggested or implied that anything [Jefferson] might say would not be used against him." In "[r]eviewing the totality of the warnings and the circumstances

30

of the interrogation," to determine whether Jefferson's *Miranda* waiver was valid, the trial court explained:

> In this case the court had the benefit of watching the video-recorded interview and observed the non-coercive and non-deceptive tactics employed by the experienced detective. The court also observed the level of comprehension and understanding exhibited by [Jefferson], who remained calm and collected throughout the interrogation. The court finds that [Jefferson] fully understood the *Miranda* warnings and that his election to speak with Detective Glass was a choice that he made freely, knowingly, intelligently and voluntarily.

The trial court went on to note that the failure to advise Jefferson, standing alone, did not render his *Miranda* waiver involuntary.

Our review of the record leads us to conclude that the trial court's factual findings were not clearly erroneous. The time between Jefferson's arrest and the subject interview was less than two hours. After asking Jefferson a series of biographical questions, the Detectives proceeded to secure Jefferson's *Miranda* waiver. Jefferson was 23 years old at the time of the interrogation and had obtained a GED. Detective Glass read Jefferson's *Miranda* rights from a form and confirmed after each right that Jefferson understood. At the end of his recitation of the *Miranda* rights, Detective Glass again asked Jefferson if he understood his rights and Jefferson responded in the affirmative. Jefferson then signed the form confirming he understood his *Miranda* rights. Thereafter, Detective Glass began questioning Jefferson about the events of February 17, 2022. During the interview, the Detectives asked Jefferson multiple times if he needed any water. It was not until the end of the hour-and-a-half interrogation -- and after Jefferson had confessed to shooting

31

Genao -- that Detective Glass informed Jefferson he had been charged with first-degree murder.

The mere fact that Jefferson was unaware of the pending first-degree murder charges is not dispositive in our analysis of whether Jefferson's *Miranda* waiver was valid. The record demonstrates that Jefferson was aware of the nature of his *Miranda* rights and waived them knowingly, intelligently, and voluntarily with an understanding of the consequences of waiving those rights, namely that his incriminating statements could be used against him. We, therefore, conclude that the trial court did not err in admitting Jefferson's custodial statements to the detectives.

### III. Any error in admitting testimony from the State's firearm and toolmark examiner was harmless beyond a reasonable doubt.

Finally, to provide guidance to the trial court on remand, we address whether it was an abuse of discretion for the trial court to permit certain portions of the State's firearm and toolmark examiner's ("the firearm examiner") expert testimony. Jefferson contends that the firearm examiner's testimony was the functional equivalent of "unqualified testimony of a match between a particular firearm and a particular crime scene bullet," which the Supreme Court of Maryland expressly disavowed in *Abruquah v. State*, 483 Md. 637, 695 (2023).

Specifically, Jefferson takes issue with the firearm examiner's testimony that "[a]ll firearms possess individual markings that make it unique to that firearm" and that such markings on the ballistics evidence were consistent with such markings on the test fired cartridge cases and bullets. The State counters that the firearm examiner's testimony was

precisely the type of testimony that the Supreme Court of Maryland held was permissible in *Arbuquah*. Moreover, the State contends that, even if the trial court erred in admitting the firearm examiner's testimony, such error was harmless beyond a reasonable doubt because the jury was informed of Jefferson's admission that he shot Genao and gave the gun to Garcia.

Assuming, without deciding, that the challenged expert testimony from the State's firearm examiner was the functional equivalent of the type of testimony rejected in *Abruquah*, we conclude that such error is harmless beyond a reasonable doubt. Indeed, unlike the testimony in *Abruquah* -- which "was the only direct evidence before the jury linking Abruquah's gun to the crime" -- the jury in the present case was presented with Jefferson's admission that he shot Geano and subsequently gave the gun to Garcia. *Id.* at 697. In such circumstances, we are satisfied that any error in not limiting the firearm examiner's testimony did not affect the jury's verdict and, therefore, was harmless beyond a reasonable doubt.[12]

## CONCLUSION

For the foregoing reasons, we hold that the trial court erred in refusing to instruct the jury on both perfect and imperfect defense of others because there was "some evidence" to generate such instructions. We further hold that the error in failing to instruct the jury on both perfect and imperfect defense of others was not harmless beyond a reasonable doubt. In addition, we conclude that Jefferson's *Miranda* waiver was valid and the trial

---

[12] Of course, if the evidence at retrial is different than what is before us, the trial court can and should revisit this issue.

court did not err in admitting his custodial statements. Finally, we hold that any error in admitting testimony from the State's firearm and toolmark examiner regarding the consistency between the "unique" and "individual" markings on the test fired cartridge casings and bullets and the "unique" and "individual" markings on the ballistics evidence was harmless beyond a reasonable doubt. We, therefore, vacate the judgments of the trial court and remand for further proceedings consistent with this opinion.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASE REMANDED FOR A NEW TRIAL. COSTS TO BE PAID BY MONTGOMERY COUNTY.**